# The Pennsylvania Coal Company *versus* Sanderson and Wife.

1. Damages resulting to another, from the natural and lawful use of his land by the owner thereof are, in the absence of malice or negligence *damnum absque injuria.*

2. One operating a coal mine in the ordinary and usual manner may upon his own lands drain or pump the water which percolates into his mine into a stream which forms the natural drainage of the basin in which the mine is situate, although the quantity of the water may thereby be increased and its quality so affected as to render it totally unfit for domestic purposes by the lower riparian owners.

3. The use and enjoyment of a stream of pure water for domestic purposes by the lower riparian owners, who purchased their land, built their houses and laid out their grounds before the opening of the coal mine, the acidulated waters from which rendered the stream entirely useless for domestic purposes, must *ex necessitate* give way to the interests of the community, in order to permit the development of the natural resources of the country and to make possible the prosecution of the lawful business of mining coal.

4. Sanderson *v.* The Pennsylvania Coal Company, 5 Norris, 401, overruled.

February 2d, 1886.  Before Mercur, C. J., Gordon, Paxon, Trunkey, Sterrett, Green, and Clark, JJ.

Error to the Court of Common Pleas of *Lackawanna county :* Of January Term 1885, No. 389.

This was an action on the case brought by J. Gardner Sanderson and Eliza McBriar his wife in right of said wife against The Pennsylvania Coal Company to recover damages sustained by her from the loss of a stream of water which flowed through her grounds and which was rendered entirely useless for domestic purposes by the defendants discharging mine water from their mines into it.   Plea, not guilty.

The facts of the case as they appeared upon the trial before Archbald, J. are sufficiently set forth in the charge of the court and in the opinion of the Supreme Court.

The following is the charge of the court, Archbald, J.: This is an action brought by Eliza McBriar Sanderson against the Pennsylvania Coal Company, to recover damages for the alleged pollution of the waters of Meadow Brook by the defendant.   The principles of law involved in this case have been settled by the several decisions of the Supreme Court already made in this case, (5 Norris, 401; 13 Norris, 302; 6 Out., 307.)   The facts in the case, or the questions of fact upon which you will have to pass, are not many, although it has been necessary in order to throw light upon them to introduce

a great number of witnesses who have been heard by you, and
the discussion of the many facts that have been put in evi-
dence to illustrate these several questions of fact which I
shall submit to you.   [It appears from the evidence, that in
1868, Mrs. Sanderson purchased some land in that part of the
city which is now known as Green Ridge, with a view of erec-
ting a residence there.   Through a portion of this land flowed
this stream, which is known as Meadow Brook.   The fact
that this stream flowed through the land was, as it appears,
one of the inducements which led this lady to look at that
spot, and to make that purchase for the purposes of a residence,
in the hope that the waters of the stream might be utilized
for domestic purposes, and other useful purposes about the
ground.   With a view to determine that fact, her husband,
Mr. J. Gardner Sanderson, made an examination of the stream,
following it up from where it ran through these grounds, all
along its course, and noting its condition as he went.   He
followed it all the way up, found that it was covered over, as
he says, more or less, with willows, hazels and other shrubbery
that is customarily growing along a stream, and went away
up to the Gipsy Grove swamp, and still further beyond that
toward the Little Roaring Brook.   He examined especially,
as he says, to see if there was anything deleterious coming
from any place about there that might vitiate the waters of
this stream.   He was satisfied, and this plaintiff, as it appears,
was satisfied from that examination, that the water in the
stream was pure, and that it would be fit for such uses and
purposes as they designed to make of it.]   Accordingly the
various water-works and apparatus that you have heard de-
scribed, were put in there ; a dam was erected upon the land
purchased of Van Fleet, in order to get a sufficient head ; from
that a conduit pipe was laid which led to the cistern and
hydraulic ram ; that, as you know, is a simple mechanical
appliance frequently used for the purpose of raising water
from a lower to a higher level, and often for just such pur-
poses as it was put to, according to the evidence, in this case.
From that ram the water was forced up through pipes leading
to a tank in the attic of Mrs. Sanderson's house, and from
there it was distributed through the house, to the boilers, for
the purpose of being heated, and to the water-closets, and to
a bath-room, and it was also taken to a steam apparatus, which
was put in the house for the purpose of heating the house
through steam radiation, as it is called.   Still further down
upon the stream, and within the very grounds of Mrs. Sander-
son, a large dam was erected.   This served several purposes,
ornamental as well as useful.   It was stocked with fish ; gal-
vanized iron screens were put at the head and at the foot of

[Pennsylvania Coal Co. *v.* Sanderson.]

this dam so as to prevent the fish escaping, and from this was laid another pipe, also leading to an hydraulic ram, which forced the water upon the lawn for the purposes of irrigation there, and for the purpose of supplying a fountain. Also from this dam, as I remember the testimony, there were water-pipes leading to the barn, for the purpose of using the water there to water the horses and cattle ; also to the house of Mr. Sanderson's gardener, for use there.

They continued, it seems, in the use of this water, after the erection of the house, for some two or three years, when the character of the water, as they say, became changed, so completely changed as to be unfit for ordinary domestic use ; they had to abandon it for washing and cleaning purposes, for culinary purposes, and in general for all useful purposes in the house ; the fish were killed in the pond, and if I remember the evidence in 1874, it was abandoned finally for any purpose connected with the house.

Now let us turn our attention to some of the other facts as they appear in the evidence. It seems about the same time, in 1867 or 1868, the Pennsylvania Coal Company, who owned large tracts of land near the head of this stream (some sixteen hundred acres, it is said) began excavating certain tunnels about the Gipsy Grove swamp with the intention of erecting a breaker there and making developments of the coal property. They first drove in 1867, I think one tunnel; and in 1868 other tunnels, until they finally had four tunnels opened there. These, if you believe the evidence, were opened until they struck the coal, the coal being piled outside the tunnel awaiting the erection of a breaker there. The company also sunk a shaft perpendicularly down into the earth, for the purpose of raising coal from a lower vein, and began building their breaker. That was built, I believe, in about the year 1870. They encountered water in the sinking of this shaft, and they had to raise that water to the surface. After they had reached the vein it was pumped from the mine, as opened to that vein, thrown upon the ground, or into a ditch and conveyed away, until it finally reached the waters of Meadow Brook somewhere in this swamp.

Now the several questions of fact upon which you will have to pass are these : The first is, has Mrs. Sanderson suffered any loss? If she has, has that loss been occasioned by the acts of the defendant? If you find that also in her favor, then what is the extent of her loss, or in other words, what are the damages?

Now, gentlemen, there can be very little question on the first fact ; from the evidence, if you believe it, it would seem certain that Mrs. Sanderson has suffered loss. The question of

[Pennsylvania Coal Co. *v.* Sanderson.]

how, or from what occasion, is a more difficult question, but if you believe the evidence here, she has not voluntarily abandoned the use of this water. She has been actually prevented, from its character, from using it for any of the purposes for which she had originally designed to use it. Now, then, what was the cause of this loss to her? Upon that question, gentlemen, you will have to consider what was the condition of this stream at the time she put her waterworks up there for the purpose of using the water from it. If you find that it was in a pure condition, or sufficiently pure for ordinary domestic use, that is one side. On the other hand, if you find that it was then vitiated, even though not observed by Mr. Sanderson, so vitiated or so surrounded by that which would eventually vitiate it, then so far as it was disturbed by these circumstances existing around it, at the time she began there in 1868, for that loss of the water, or the loss of the water occasioned by anything of that kind, there could be no recovery against this defendant.

Now let us look at the circumstances bearing upon and surrounding the question of the purity of this stream. We have decided testimony that this stream, in its original condition, was a pure mountain stream, not very long in its course—a couple of miles or more, if you believe the evidence, arising in this swamp above, from the accumulation of water there, flowing down through land more or less cleared, prevented somewhat from evaporation by shrubbery growing around its banks and along its banks; that there were fish in it, bullheads or catfish, eels, minnows and chubs, also originally trout, a fish, which it is well known, requires a very pure water to live and thrive in. That was its condition originally. Now was that changed at the time Mrs. Sanderson began her improvements there, and asserted her intention, by the erection of these waterworks, to use that stream? We have the testimony of parties that at about that time they made use of it; the testimony of several witnesses that it was soft in character, that they were able to drink it, except in warm weather when it got somewhat low. And Mrs. Robinson and Richard Robinson, her husband, who were in the employ of Mr. Sanderson, stated that they used it for ordinary domestic purposes; had no trouble with it; washing and cleaning with it, making tea and coffee, and using it for the ordinary purposes of the kitchen. Mr. Brundage, who lived along the stream, testified to about the same facts, also Mr. Long. Dr. Fordham made use of it for a while until he discovered a spring in his cellar. We have in addition to that the testimony of J. Gardner Sanderson and George Sanderson, and I think of Mr. Robertson, all bearing upon this question, that in the ordinary

3 AMERMAN—9

condition of the stream it was of pure character, entirely fit for the use they would ordinarily make of such water, or for such uses as Mrs. Sanderson designed to make of it.

On the other hand, you have the testimony that this was coal land; that there were boreholes opened along this stream, from which flowed water, more or less impregnated with the same qualities that would come from water that had passed through a mine.    That in this little branch that ran into this stream at Forest Hill there were openings, opened a great many years before this; that there was an out-cropping along on the Dickson property, some little ways above, although there is contradictory testimony as to this; that this was only opened as the result of a freshet; also, that there was water coming from tunnels at Gipsy Grove; you have the testimony of parties that water was even then, in 1868, coming from these into the stream; also the filling of the Jessup railroad—the old abandoned Jessup road—reaching across this swamp, made up largely of culm.    It is answered to that, that the deleterious substances existing in this culm would, in the long lapse of years, by the action of the sun and wind and rain, become purified.    These are questions for you bearing upon the one side or the other, either that this was in a proper condition, a pure condition, or that it was not.    It is not for me to suggest at all which has the weight of evidence; that is for you; these facts are facts that you, gentlemen, must pass upon and not the court.

They also state that the old burial place, in a portion of the present Dunmore cemetery, was then existing, and that that would have a bearing upon these questions.    Now that is the first question for you to determine.

The next question, if you determine that this was a pure stream, fit for the purposes for which it was designed by Mrs. Sanderson in the erection of her apparatus, is, whether the subsequent loss was the result of any acts of the defendant in polluting this stream.

[Now, just here, gentlemen, I may as well dispose of one matter which has been disposed of in the Supreme Court in the several decisions which you have heard quoted here and spoken of, and that is, the claim on the part of this defendant that they had the right to cast their water upon the ground; that they necessarily met with water in mining coal, and that if they are prevented from raising this water to the surface they cannot mine their coal and must stop their mines; that the plaintiff well knew that she was in a mining region; that the tracts of land along the stream were known as coal lands; that the evidence of coal prospectings and coal-croppings existed all along the banks of this stream.

[Pennsylvania Coal Co. v. Sanderson.]

Now, if under the law they had such right it would be a perfect answer to the plaintiff's complaint of injury. But, gentlemen, this question has been settled against the defendant; it has been put at rest by the decision of the Supreme Court in this very case, and the determination of that Court must rule here. It must not only guide me in my announcement of the law to you, but it must guide you also, because it is not for you to say what the law is; you must receive the law from the Court as it is laid down, and if we make any error the Supreme Court will correct that, and it would be a very unsafe rule if the jury in the jury-box could say what the law ought to be.

The Supreme Court have decided that this plaintiff is entitled to have this stream flow uncontaminated by the defendant, as it flowed naturally when she became an owner along its banks; and that, if by the action of the defendant in pouring its mine water into the stream the plaintiff has been injured, she is entitled to recover damages from the defendant for such injuries.]

Now, there is no question, of course, but what the mine water pours into this stream. Was it deleterious, or did it work the injury to the plaintiff that is complained of? And if it did, to what extent?

Now, of course, it is not the character of the water as it comes from that mine that entirely controls. Mrs. Sanderson does not live immediately adjoining the mine, but some mile and a half or two miles below where this water pours into this swamp. Therefore the question is not free from difficulty, or at least is a question of fact that must be determined by you, and not by me, as to what caused the injury to her. You have heard the analysis of this water read to you, as made by Mr. Gifford, a chemist from Brooklyn, that analysis being made of the water as it was in 1879. You have also heard the testimony of the several witnesses who have observed the stream in 1875 and since this action was begun, and who say that there had been no change in its conditions. If that be the case, then this analysis furnishes us some guide in determining what was the character of the water as it reached Mr. Sanderson's house.

Now, gentlemen, this analysis shows the presence of sulphuric acid, and to what extent, in exact substance, is shown to you by these bottles; they exhibit the amount of each substance in the water, as found by this chemist, in each gallo of water from that stream. He also gives you an analysi pure water, of the water taken from the little stream w runs into this stream at Forest Hill cemetery, and in fish were seen to live, and, by that comparison, you

there is considerable difference in the amount of these ingredients ; and, although it may seem small to us as it is measured out, still the question is a question of fact for you under the evidence, whether a sufficiently deleterious amount of sulphuric acid, or other impure substance, which came from this mine, reached Mrs. Sanderson's, so as to work the injury here complained of.

We have the testimony in regard to the character of this water also from the two men who opened the tunnels, Sawyer and Finerty, who do not hesitate much about saying, perhaps, what a good many of you know, that mine water is not such water as is customarily drunk or used for domestic purposes. Mr. Smith says that at times he believes this mine water would be injurious; that he was fearful it might hurt the boilers, and therefore they got water from some other place, and that he knew, the water would be injurious if the creek was low.

Now the testimony is, that in a dry time, say in August, that the flow of water in this stream, if you believe the testimony of J. Gardner Sanderson, amounted to something over 882,000 gallons per day of twenty-four hours, while I believe it is in evidence, as this mine water is pumped out, that the flow is some 921,000 per day. That is, that there would be about as much mine water pumped into the stream up there as was the original average flow in this stream at Gardner Sanderson's dam in a dry time like August.

You have also, as bearing upon that question, the peculiar effect of this mine water in this stream, whether it was sufficient to cause the injury complained of; the testimony of witnesses as to how the water acted about the time that the breaker was fully opened and in force, completed and in full running order; and about that time, and increasing from that time until the abandonment by Mrs. Sanderson of the use of these works, you have the testimony of these several witnesses that the water became gummy when washing in it with soap, and that soap would not assimilate with the water; that the fish in the stream died, and other facts of the same character which you will remember. Also, that the action upon the pipes was the action of acids, or acidulated water as it is called here, water impregnated with acids; although there is some evidence that even the purest water will corrode, it is for you to determine whether this corrosion, this eating out, was such would occur ordinarily by the ordinary action of water, or ther it was the result of some corrosive substance, like in the water, and if it was acid, did it come from the mped in accompanying this mine water and in solution

[Pennsylvania Coal Co. v. Sanderson.]

On the other hand, you have the testimony of Mr. Sherrerd and of the other witnesses, in regard to the effect of ordinary water which I have just referred to, as well as the theory that at such a distance there would not be sufficient sulphuric acid in solution there to corrode the pipes any more than they would ordinarily be corroded. He however admits that if this water were heated, containing this sulphuric acid, that there might be a corrosive action as the result.

Now you will determine, gentlemen, which you will believe of these sets of circumstances. Will you believe the actual facts, the facts I mean testified to by these several witnesses, their actual experience with the water, or is the testimony adduced on the other side of more force to your minds, and the theories that they advocate? This is a question for you.

If you determine that the action of this mine water is not such as is claimed by the plaintiff here, and that these injuries to her resulted from other causes, then of course she could not recover. If, however, you find that the injuries she complains of were the result of this mine water being pumped into that stream, then she could recover to the extent of the damages which she has shown as the result of the mine water being so turned into the stream.

You will notice I confine you to such injuries as are the result of this mine water being pumped in there. If the injuries which the plaintiff complains of were wholly or in part the result of other deleterious substances which have come into the stream, then to the extent that she is injured by these other causes, of course the defendant could not be called upon to answer.

[Bearing upon that question you have the testimony that has been brought out on the part of the defendant in relation to the mine water coming in from these different places. These facts that they have adduced have a double bearing, first, in regard to the original purity of this stream when Mrs. Sanderson first came there, and first put up her works, and again in regard to what it affected afterwards. If you find that any part of this injury was occasioned to Mrs. Sanderson from the mine water coming from these other tunnels opened before she began—opened before she put up her works—but the water coming out afterwards, or any injury caused by deleterious substances coming into the stream from running over croppings, or from old excavations, prospecting for coal, or any that might come from the cemeteries, or from the privies and barns and barn-yards, or from the slops of houses built up along that stream, any injuries resulting from those causes, the defendant would not be liable for. Now it is a question for you to say how much, if any, of the injuries complained of

was the result of those other causes. If none of them caused the injuries complained of here, if all the injuries were brought about by the pollution of this stream through the mining of the defendant, then Mrs. Sanderson would be entitled to recover. If only part was caused by their mine water, then only part of the damages they would have to respond for. If none was caused by this mine water, if all was caused by those other deleterious substances, or would be caused in the natural order of things, of which you are to judge, as reasonable men, from your known experience, you will find accordingly, either for the whole or part, or none at all of these damages.]

Now, gentlemen, the final question is, if you find all these prior questions in favor of the plaintiff, find that she has suffered injury, find that this injury has been brought about by the pollution of the stream from the mine water of the defendant, in whole or in part, then the question comes up, and the final question you are to pass upon, the damages she has sustained. .

Now there is no doubt, from the evidence, that Mrs. Sanderson made extensive and important improvements for the purpose of using this water, which were expensive to her. If she has been injured she is entitled to recover to the extent shown to you. [You have heard the testimony of Mr. Sanderson expressing the items of damage which he claims. So far as you are satisfied that they represent the actual damage received by the wrongful act of this defendant, so far you will award in her favor, and express by the amount of your verdict, no more, no less. She is entitled to damages according to the evidence, from what she has shown], and you are to judge and be guided solely by the evidence and the law; the evidence as you have heard it from the witnesses, and the law as you receive it from the Court.

The plaintiff and the defendant have both requested me to instruct you in certain matters—theories of the law applicable to this case, as they conceive it. I will read you these points in their order, first giving you the plaintiff's, then giving my answers to each point.

1. "If the jury find from the evidence that the operations of the defendants by polluting the waters of Meadow Brook caused an injury to the plaintiff prior to the beginning of her action, then she is entitled to recover as damages such an amount as will compensate such injury."

Answer of the Court. This is correctly stated, and we instruct you that the law is as stated in that point.

2. "That the measure of damages is compensation for the injury resulting from the acts of the defendants; therefore, the verdict, if for the plaintiff, should be for such sum as will

compensate the plaintiff for such actual loss and injury suffered by her previous to the bringing the present action as the jury shall find was caused by the acts of the defendants."

Answer of the Court. This is also correct, and is affirmed.

3. "If the jury believe the evidence produced on the part of the plaintiff, their verdict should be for the plaintiff."

Answer of the Court. We answer that in this way: If from the whole evidence produced here before you, you are satisfied that the theories as explained to you by the plaintiff are the correct ones, if you are convinced that the theory of the plaintiff represents the true facts in the case, then, of course, you will find for the plaintiff.

4. "If the jury find that plaintiff is entitled to recover, it is their duty to return a verdict for an amount sufficiently to compensate her for the loss suffered by her from the defendant's fouling the waters of Meadow Brook; and in determining this amount they are to be governed by the evidence of the amount of damages she has suffered from this cause; they have neither discretion nor lawful power to find damages in a less sum than that shown by the evidence. Therefore, the verdict, if for the plaintiff, should be for the full amount of damages which the evidence shows that plaintiff suffered up to the time of bringing this suit, to wit, November 12th, A. D. 1875, with interest on the said amount to the present date."

Answer of the Court. This is substantially as we have already charged you, and we affirm the point.

The points presented on the part of the defendant are as follows, and my answers to them I will express after reading each point.

1. "If the jury believe, from the evidence, that it was impossible for the defendants to mine their coal on their lands along this stream without discharging the mine water from their mines, and the mining was done without malice or negligence, and that no foreign substance was introduced into the water by the defendants; and that when the mine water was so discharged it followed the law of gravity, as directed by the natural conformation of the land, and flowed by a natural flow into this stream, and thence through the plaintiff's property, then, even if thereby the plaintiff was damaged, it is *damnum absque injuria*, and plaintiff cannot recover."

Answer of the Court. My answer to this is this: The law herein stated is ruled by the several decisions of the Supreme Court made in this case, and in accordance with the decision of that Court this instruction to you must be refused.

2. "That in this case the defendants can only be held liable for the result of their own acts; and if the jury find from the evidence that this stream had been so far impaired by the i

troduction of impurities as to be unfit for domestic use before the defendants began to pump from the Gipsy Grove shaft, then the plaintiff cannot recover for loss occasioned by being deprived of the use of the water for domestic purposes."

Answer of the Court. This statement of the law is correct, and we instruct you as requested in this point.

3. "If the jury find that the water of the stream was deteriorated by the joint act of the defendant and other persons to the injury of the plaintiff, then recovery can be had from defendants of only so much as the evidence proves their wrongful act contributed to the injury."

Answer of the Court. I suppose they mean in stating this point, "other persons," "other causes," with that correction, I consider the point as correctly stating the law, and so instruct you.

4. "If the jury find, from the evidence, that at the time the plaintiff erected her fixtures, for the purpose of using the water of the stream, the same was unfit for domestic use, and that the fact was reasonably within the plaintiff's knowledge, she cannot recover for the value of such fixtures."

Answer of the Court. I answer that as follows: This instruction is refused. The point fails to recognize that the water might have some useful purpose other than domestic, as for instance the watering of the grounds, the watering of stock, etc., for which, to some extent at least, as it appears from the evidence, the fixtures of Mrs. Sanderson were put up.

5. "If the jury find, from the evidence, that the plaintiff is still possessed of the land, dams, rams and plumbing works, for the loss of which damage is claimed, and that the same has not been materially impaired in value, she can recover only the loss actually sustained, if any, and not the value of the property."

Answer of the Court. This is correctly stated, and is affirmed.

Now, gentlemen, in the consideration of this case, under your oaths, you should dismiss all prejudice; you are neither to find against this defendant because a corporation, nor in favor of the defendant and against the plaintiff, from any of the circumstances which have been urged upon you, and which the Supreme Court have said do not rule this case. Give your verdict, after careful consideration, according to the law as laid down by the Court, and according to the evidence as you have heard it from the mouths of the witnesses. As has been well said to you by counsel, you are not answerable for the consequences of the law. You are simply to find under your oaths, according to the evidence and in accordance with the law. You are to endeavor, if you find a lack of harmony,

when you retire into your jury room, to reconcile your views one with the other, not to obstinately assert the views that you may have, but to agree the one with the other. This, while an important case, is governed by simple principles of law, and the facts are not so difficult perhaps, judging of them as reasonable men, but that you can readily arrive at a verdict.

Verdict for the plaintiffs for $2,872.74, and thereupon judgment; whereupon the defendants took this writ, assigning for error, *inter alia*, those portions of the charge included within brackets, and the answers of the Court to the plaintiffs' first, second, third and fourth points, and to the defendant's points.

*Henry M. Hoyt, Henry W. Palmer (Andrew T. McClintock, Willard & Warren, J. M. & W. P. Gest* with them), for plaintiffs in error.—1. The question involved here is one of new impression in this state, and, notwithstanding previous decisions of the Court in this case, is still open to discussion.

This can be readily shown by a consideration of the opinions delivered by Judge WOODWARD in 5 Norris, 401 (with dissenting opinion of Judge PAXSON, 6 W. N. C., 101); the opinion of Judge GORDON in 13 Norris, 302, and of Judge TRUNKEY in 6 Out., 370.

2. The true theory of negligence as developed in the law of torts, both in England and in this country, is:

Damages resulting to another from the natural and lawful use of his land by the owner thereof are, in the absence of malice, *damnum absque injuria;* and the corollary of this rule is:

When the maxim *sic utere tuo ut alienum non lœdas* is applied to landed property the plaintiff must show not only that he has sustained damage, but that the defendant has caused it by going beyond what is necessary in order to enable him to have the natural use of his own land: BRETT, L. J., in West Cumberland Iron Co. *v.* Kenyon, L. R., 11 Ch. Div., 783.

If a defendant has confined himself to the necessary means of lawful enjoyment of his land, the damage arises not from his act, but *ex necessitate,* and the plaintiff's loss is as much the result of *vis major,* the act of God, or whatever name may be given to the unavoidable, as though it were caused by lightning or flood. If, in our case, we cannot use our land for the natural purpose of mining coal because our neighbor cannot keep his tame fish in his pond, the same rule should apply to him. He should not be allowed to maintain a fish-pond so near our mine that we cannot use it. His pond as effectually prevents our mining coal on our own property as if he should turn a stream into our shaft and fill it to the level of the ground.

[Pennsylvania Coal Co. *v.* Sanderson.]

Recollecting, then, that these facts exist in our case :

1. We are making a natural, proper and lawful use of our own land :

2. No direct damage is caused to the plaintiff by our mining and pumping :

3. The discharge of water from our mine is absolutely necessary for working our mine, and it is discharged in the same condition in which it came there, without pollution by us :

4. It is unattended with either negligence or malice, and is done in a proper manner by competent persons :

5. The flow of water into Meadow Brook is *caused* by the natural law of gravitation acting upon the water as it naturally collects on our own premises;—we will now examine the cases upon the subject. And as the contention has been heretofore made mainly upon the English cases, we will review them first.

Fletcher *v.* Rylands, 3 H. & C., 774; L. R., 1 Ex., 265; 3 H. L., 330, is to be understood as laying down a general rule that every man acts at his peril, and if in the commission of a lawful act, he occasions consequential damages to his neighbor, he is liable therefor without proof of actual negligence or malice, is not the law in the United States: Loree *v.* Buchanan, 51 N. Y., 476; Garland *v.* Towne, 55 N. H., 57; Marshall *v.* Welwood, 38 N. J. Law, 339; Phelps *v.* Nowlen, 72 N. Y., 39; Pixley *v.* Clark, 22 Barb., 268. The doctrine of Fletcher *v.* Rylands has been restricted by subsequent decisions in England to such an extent as to show that even there it is considered unsafe as a general rule of liability: Nichols *v.* Marsland, L. R., 10 Ex., 255, 2 Ex. D., 1; Box *v.* Jubb, 27 W. R., 415; Ross *v.* Fedden, L. R., 7 Q. B., 661; Madras Railway Co. *v.* Zemindar of Carvatenagarum, L. R., 1 Ind. Ap., 364; Tipping *v.* St. Helen's Smelting Co., L. R., 1 Ch., 66, 11 H. L. C., 642; Cavey *v.* Ledbitter, 13 C. B., N. S., 476; Bamford *v.* Turnley, 3 B. & S., 66; Smith *v.* Kenrick, 7 C. B., 515; Fletcher *v.* Smith, L. R., 2 App. Cases, 781; Smith *v.* Fletcher, L. R., 7 Ex., 305, 9 Ex., 64; Wilson *v.* Waddell, L. R., 2 App. Cases, 95; Baird *v.* Williamson, 15 C. B., N. S., 376; West Cumberland Iron Co. *v.* Kenyon L. R., 6 Ch. Div., 783.

These views are supported by the reasoning of all our own cases which touch on the subject. The right of mines to drain into rivers has always been recognized—at least it has always been acquiesced in in this State. The only case in which the contrary doctrine has been even suggested is the New Boston Coal Co. *v.* Pottsville Water Co., 54 Pa. St., 164, in which the water company sought to enjoin the coal company from pumping their mine water into the stream. The Court refused

the injunction though without expressing an opinion on the present question, and it is noticeable that the contest did not go further. (In point of fact the Pottsville Water Company recognized the situation, abandoned the suit and found other sources of supply:) Kauffman v. Griesemer, 2 Casey, 407, and Martin v. Riddle, Id., 415, decided that the owner of the superior heritage may improve his lands by agricultural or mining operations, although thereby the quantity of water discharged upon the inferior owner is changed. This is said to occur when necessary for carrying on agricultural and mining operations. By a parity of reasoning the same rule should include a necessary alteration in the quality of the water.

Judge WOODWARD'S opinion in Kauffman v. Griesemer was adopted in the precisely similar case of Hughes v. Anderson, 68 Ala., 280. STONE, J., remarking, "the rough outline of natural right or natural liberty must submit to the chisel of the mason, that it enter symmetrically into the social structure."

See also Wheatley v. Baugh, 1 Casey, 528; Locust Mountain Coal Co. v. Gorrell, 9 Phila., 247.

We cannot better sum up our conclusions on this subject than by citing the language of Judge REDFIELD, in his note on Swett v. Cutts, 11 Am. Law Reg., N. S., 24. Says he, "It must be conceded, we think, that the right of land owners to deal with surface water and all water mixed with the soil, or coming from underground springs, in any manner they may deem necessary for the improvement or better enjoyment of their own land is most unquestionable. And if by so doing, in good faith and with no purpose of abridging or interfering with any of their neighbors' rights, they *necessarily* do damage to their neighbor's land, it must be regarded as no infringement of the maxim, *sic utere tuo ut alienum non lœdas*, but must be held, *damnum absque injuria*."

This is really a case for the application of the great maxim relating to landed property, *cujus est solum ejus est usque ad cœlum*, which in the revised version reads, so far as our case is concerned, *Cujus est solum ejus est usque ad sheolum*.

3. In order to permit the development of the natural resources of the country and the free prosecution of a lawful business, "the trifling inconveniences to particular persons must sometimes give way to the necessities of a great community." The only question here is, what constitutes a reasonable use of the watercourse under the necessities of the case, and this question is for the jury.

This stream drains a watershed of 1,600 acres, at least, of coal land. A shaft had been sunk within the watershed and near the stream in 1848; croppings of coal were visible along

the stream and boreholes and other openings into the coal were made along it in at least five places, in 1856, 1857 and 1858, and all these developments and indications showed the existence of coal along the entire length of the stream for years before the plaintiff purchased her lot on said stream. Wherever in the anthracite coal region mines are opened, water percolates into them and must flow out.   This affects the streams more or less everywhere in the mining regions, and mine water always follows as an inevitable and certain consequence of coal mining.   This is so notorious that this Court has taken judicial notice of the fact and its effects. Judge READ, in New Boston Coal Co. *v.* Pottsville Water Co., 4 P. F. S., 173, admitted what was said that a fish was a thing not to be seen in the Schuylkill in the neighborhood of mines.   The very operations now complained of have induced the population that now fills the region.   But for the development of the coal business, Scranton—within which the lot of the plaintiff is situate—would never have existed.   It is not possible that in a state producing over 30,000,000 tons of anthracite coal yearly, and 100,000,000 of anthracite and bituminous coal, every ton of which must come from mines which discharge mine water, and from which mine water must be discharged if the indispensable mineral is produced, that it can be just that this great industry is to be crippled if the mine water affects to any extent a stream into which it must flow in its natural state when brought to the surface.   The right to mine coal is not a nuisance: the exercise of that right is so far from being a nuisance that it has always been the policy of our state to encourage it, and if the natural courses for drainage are affected by the natural drainage of these mines, the consequence is inevitable and must be submitted to.   Here, as in other cases, private inconvenience must yield to public necessity: St. Helen's Smelting Co. *v.* Tipping, 11 H. L. Cases, 642; Cooley on Torts, 588.

The rule of "reasonable use" is also applied to the case of cities which are compelled to use streams as outlets to their sewers: Merrifield *v.* Worcester, 110 Mass., 216; Snow *v.* Parsons, 28 H., 462.

In California, Colorado and other of our Western States the necessities of the dry climate have produced an extensive system of irrigation.   Just as in the case before cited of the Madras Railway Co. *v.* Zemindar of Carvatenagarum L. R., 1 Ind. App., 364, the torrid climate of India requires the maintenance of large reservoirs of water, so in our Western States the rules of law have been adapted to climatic necessities, and one who uses the necessary means for irrigating and cultivating his land is not liable in the absence of negligence for damages

resulting to his neighbors: Gibson v. Puchta, 33 Cal., 303, Broom's Legal Maxims, 274: Schilling v. Rominger, 4 Col. 100; Yunker v. Nichols, 1 Col., 551.

As to what is a reasonable use of water see Prentice v. Geiger, 74 N. Y., 341; Hetrick v. Deachler, 6 Barr, 32; Hartzall v. Sill, 2 Jones, 248; Wood v. Sutliffe, 16 Jur., 75.

If Sanderson's *damnum* was the natural and necessary consequence of the manifest societary movement, in the midst of which he chose to plant himself, then it is *absque injuria.* Could a man in Pittsburg now recover against any particular contributor to the smoke of that city? If not. and the precise question is ruled in Huckenstine's Appeal, 20 P. F. S., 102, then he could not have recovered from the first contributor.

If smoke is not a nuisance to a citizen of Pittsburg (AGNEW, J., in 20 P. F. S., 102) or to a citizen of Shields (Lord Cranworth in St. Helen's Co. v. Tipping, 11 H. L., 642)—if taking water from a Colorado stream to the damage of the riparian owners is not a nuisance to a citizen of Colorado, then tincturing natural water-courses with water from mines in the anthracite region is not a nuisance to a citizen of Scranton. Sanderson was bound to take notice of the necessities of the region in which he chose to take up his residence, and to be ready in common with his neighbors to avail himself of the other and better sources of water-supply.

This mountain stream, a natural water-course, is a way of necessity. The state, in granting these coal-lands, must be presumed to have intended their natural use under the operation of natural laws of percolation, gravity, etc., and that a way of escape for the water must of necessity follow the natural watershed—must be a "way of necessity"—just as in Colorado the right of ditch transit has been compared to a "way of necessity."

4. The mining industry, like every other business and trade, has its particular usages and customs, dictated not only by convenience, but by the very necessity of the subject-matter to which they are applied. As these exist from the necessity of the case, and are part of the very law of nature itself, the private and personal interests of the individual must defer to them: Carlyon v. Lovering, 1 H. & N., 784; Rogers v. Brenton, 10 Q. B., 26; Atchison v. Peterson, 20 Wall., 507; Irwin v. Phillips, 5 Cal., 140; Saunders v. Clark, 106 Mass., 331; Jones v. Wagner, 16 P. F. S., 429.

5. Our acts are authorized by our charter, and are therefore lawful. When the legislature sanctions an act, it relieves from all liability caused by it, in the absence of negligence: Williams v. N. Y. R. R. Co., 18 Barb., 222; Mazette v. N. Y., 3 E. D. Smith, 98; Commonwealth v. Reed, 10 Casey, 275. It

is now well established, both in England and America, that when the legislature has sanctioned and authorized the use of a particular thing, and it is used for the purpose for which it is authorized, and damage necessarily results to another party, such damage affords the injured party no ground of action. In the case of malice or negligence the rule does not apply for such acts as are not authorized by the legislature. The leading case is the familiar one of Vaughan v. Taff Vale Railway Co., 3 H. & N., 742; S. C., 5 H. & N., 678, and has often been followed in this state : Railroad Co. v. Yeiser, 8 Pa. St., 366; Turnpike Co. v. The Railroad, 54 Pa. St., 345; Phila. R. R. Co. v. Yerger, 73 Pa. St., 121.

6. The plaintiff should not have been allowed to recover damages for permanent injury to the land.

The damages claimed by the plaintiff were not in accordance with the opinion of Mr. Justice TRUNKEY, 6 Out., 376; Pennington v. Brinsop Hall Coal Co., L. R., 5 Ch. Div., 773.

7. The Court below was clearly wrong in affirming the plaintiff's fourth point, and directing the jury to find not only damages for the plaintiffs, but interest on that amount. Interest cannot be allowed upon unliquidated damages: Pittsburgh Southern R. R. v. Taylor, 8 Out., 317; Weir v. County of Allegheny, 14 Norris, 413.

*A. Ricketts* for defendants in error.—This is the fourth time this case has been before the Court: 5 Norris, 401; 13 Norris, 302; 6 Out., 307.

As we are here with the very same questions presented over again, we simply refer to the foregoing decisions of this Court as settling the law of this case. We have labored through, the excessively labored fifty-six page *brief* of the argument for the plaintiffs in error, and find in it positively nothing new upon the main question. It would therefore be a work of simple supererogation to indulge in an extended discussion of the same questions already fully discussed and decided by this Court.

Mr. Justice CLARK delivered the opinion of the court, October 4th, 1886.

The Pennsylvania Coal Company is the owner of some sixteen hundred acres of anthracite coal land in the Lackawanna Valley, situate above the city of Scranton, in the basin of a small tributary of the Lackawanna river, known as Meadow Brook, into which, owing to the natural conformation of the surface, the water from these lands is drained. The company first opened the coal seams on this land by a drift, or tunnel, in the year 1867 or 1868: they drove three other tunnels and

sunk a shaft, and thereafter mining operations were exten-
sively engaged in: the establishment being known as the
Gipsy Grove Coal Works.  From the time the first tunnel
was driven, the mine water flowed, by the natural course of
gravity, into the Meadow Brook; as the operation of the
mines was increased, the volume of mine water increased.
The water which percolated into the shaft was by powerful
engines pumped therefrom, and, as it was brought to the sur-
face, it passed with the flow from the tunnel, by an artificial
water course, over the defendant's own land, into the Meadow
Brook, which, we have said, was the natural water course
for drainage of the entire basin.

The plaintiff, Mrs. Sanderson, in the year 1868, purchased a
tract of land, in the city of Scranton, some three miles below
the Gipsy Grove Works, on the Meadow Brook, near its
mouth.  The existence of the stream, the purity of its water,
and its utility for domestic and other purposes, it is said, was
a leading inducement to the purchase.  She began, and in
the year 1870 finished, the erection of a house upon the land;
in connection therewith, dams were built across the brook, to
form a fish and ice pond, and to supply a cistern; the water
was forced by a hydraulic ram from the cistern to a tank in
the house, and was used for domestic purposes and for a foun-
tain.

It is alleged that the large volume of mine water, which the
defendants poured into the Meadow Brook, has corrupted the
water of that stream to such an extent as to render it totally
unfit for domestic use; that the fish in the brook have been
totally destroyed, the plaintiff's pipes corroded and her entire
apparatus for the utilization of the water rendered wholly
worthless; and that, in consequence, about the year 1875, the
same was abandoned.   This action was brought to recover the
damages which the plaintiff alleges she has sustained, in con-
sequence of the alleged pollution of the stream.

At the trial of the cause in February, 1878, in the Common
Pleas of Luzerne county, the court, after hearing the plaintiff's
case, entered a nonsuit, on the ground that the discharge of
the mine water was a necessary incident to mining; that
there was neither malice nor negligence shown, in the opera-
tion of the mine, and the case was therefore one of *damnum
absque injuria.*   A writ of error was taken to the refusal of the
Court, to take off the nonsuit, and the case was presented for
the consideration of this Court: 5 Norris, 401.   Upon con-
sideration of the question involved, this Court was then of
opinion, that except where it is qualified by the existence of
peculiar conditions, the duty of the owner of property is de-
fined by the maxim, " *Sic utere tuo, ut alienum non lœdas;* "

that this case exhibited none of those peculiar conditions, and that the plaintiff's proofs exhibited a case which should have been submitted to the jury. A *procedendo* having been awarded, the cause was again brought to trial in the Common Pleas of Lackawanna county, where in October, 1879, a verdict was rendered for the plaintiff. A writ of error was then taken by the defendants, but this Court, adhering to the opinion contained in 5 Norris, 401, the judgment was affirmed. The plaintiffs, however, sued out a second writ to the same judgment, and assigned for error the ruling of the Court, as to the proper measure of damages, and upon this the judgment was reversed, and a *venire facias de novo* awarded. The cause was again tried in the Common Pleas of Lackawanna county in February, 1885 ; judgment was again entered for the plaintiff ; and it is to this judgment that the present errors are assigned.

The questions which are now to be considered with a single exception, perhaps, being identical with those which ' re previously considered and embraced in the judgment reported in 5 Norris, 401, the argument has been practically a re-argument of the original case. We have before us not only the same parties, and the same questions, but the same case, and if it be true, as it is most persistently argued, that this Court was mistaken in its former ruling, it is well that the error should be righted in the same case in which it occurred.

If we lay aside our own previous decisions of this case, and regard the cause as coming before us upon a re-argument, the main question involved is one of new impression in this state. This Court was not then, and is not now, in harmony with reference to it.

It has been stated that 30,000,000 tons of anthracite and 70,000,000 of bituminous coal are annually produced in Pennsylvania ; it is therefore a question of vast importance, and cannot on that account be too carefully considered. For, if damages may from time to time be recovered, either in the present form or as for a nuisance, punitive sums may be resorted to, to prevent repetition, or to compel the abatement of the nuisance. Indeed, if the right to damages in such cases is admitted, equity may and under the decisions of this Court undoubtedly would, at the suit of any riparian owner, take jurisdiction, and upon the ground of a continuous and irreparable injury, enjoin the operation of the mine altogether. Whatever rights Mrs. Sanderson may have to the use of this water, and whatever remedy she may have in this case, or in any other form, in law or in equity, is the right and remedy of every other riparian owner, along Meadow Brook, and whatever may be the rights and remedies of the owners on Meadow

Brook, are, of course, the rights and remedies of all other riparian owners throughout the Commonwealth. It may be that Mrs. Sanderson adopted a more extensive arrangement for the use of this water than any other person, and is consequently more inconvenienced on that account; but the law is the same in her case as in all other cases; if she may recover damages in a large amount, others similarly but less affected, may recover in a less sum. Besides, these riparian owners are not limited to their present modes of enjoyment; it is impossible to foresee what other modes of enjoyment they, or their successors in title, may adopt; or to estimate the extent of damages to which the continued pollution of the stream might proceed; hence, if the responsibility of the operator of a mine is extended to injuries of the character complained of, the consequence must be that mining cannot be conducted, except by the general consent of all parties affected.

It will be observed that the defendants have done nothing to change the character of the water, or to diminish its purity, save what results from the natural use and enjoyment of their own property. They have brought nothing on to the land artificially. The water as it is poured into Meadow Brook, is the water which the mine naturally discharges; its impurity arises from natural, not artificial causes. The mine cannot, of course, be operated elsewhere than where the coal is naturally found, and the discharge is a necessary incident to the mining of it.

It must be conceded, we think, that every man is entitled to the ordinary and natural use and enjoyment of his property; he may cut down the forest trees, clear and cultivate his land, although in so doing he may dry up the sources of his neighbor's springs, or remove the natural barriers against wind and storm. If, in the excavation of his land, he should uncover a spring of water, salt or fresh, acidulated or sweet, he will certainly not be obliged to cover it again, or to conduct it out of its course, lest the stream, in its natural flow, may reach his neighbor's land. It has always been considered that land on a lower level owes a natural servitude to that on a higher level, in respect of receiving without claim for compensation by the owner, the water naturally flowing down to it. In sinking his well, he may intercept and appropriate the water which supplies his neighbor's well: Acton v. Blundell, 12 M. & W., 324; Wheatley v. Baugh, 1 Casey, 528; Haldeman v. Bruckhart, 9 Wr., 514; or if his own well is so close to the soil of his neighbor, as to require the support of a rib of clay or of stone on his neighbor's land, to retain the water in the well, no action will lie against the owner of the adjacent land for digging away such clay or stone, which is his own property, and thereby letting out the water: Wh. on Neg., 939. He may, to a rea-

3 AMERMAN—10

sonable extent, *jure naturæ* divert water from a stream for domestic purposes, and for the irrigation of his land: Messinger's Appeal, decided October 5th, 1885.

So also each of two owners of adjoining mines has a natural right to work his own mine, in the manner most convenient and beneficial to himself, although the natural consequence may be, that some prejudice will occur to the owner of the adjoining mine: Smith *v.* Kendrick, 7 C. B., 505. One mine owner may thus permit water, naturally flowing in his own mine, to pass off by gravitation into an adjoining or lower mine, so long as his operations are carried on properly and in the usual manner: Bainbridge on Mines, 297. To the same effect are Wilson *v.* Waddell, L. R., 2 Appeal Cas. 95; Crompton *v.* Lea, L. R., 19 Eq., 115.

The defendants, being the owners of the land, had a right to mine the coal. It may be stated, as a general proposition, that every man has the right to the natural use and enjoyment of his own property, and if whilst lawfully in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria*, for the rightful use of one's own land may cause damage to another, without any legal wrong.

Mining in the ordinary and usual form is the natural user of coal lands; they are, for the most part, unfit for any other use. "It is established," says COTTON, L. J., in West Cumberland Iron Co. *v.* Kenyon, 11 L. R., 6 Ch. Div., 773, "that taking out mineral is a natural use of mining property, and that no adjoining proprietor can complain of the result of careful, proper mining operations." In the same case BRETT, L. J., says: "The cases have decided that where that maxim (*sic utere tuo ut alienum non lœdas*) is applied to landed property, it is subject to a certain modification; it being necessary for the plaintiff to show, not only that he has sustained damage, but that the defendant has caused it by going beyond what is necessary in order to enable him to have the natural use of his own land." L. R., 11 Ch. Div., 787.

The right to mine coal is not a nuisance in itself: It is, as we have said, a right incident to the ownership of coal property, and when exercised in the ordinary manner, and with due care the owner cannot be held for permitting the natural flow of mine water over his own land, into the water course, by means of which the natural drainage of the country is effected.

There are, it is well known, percolations of mine water into all mines; whether the mine be operated by tunnel, slope or shaft, water will accumulate, and, unless it can be discharged, mining must cease. The discharge of this acidulated water is

[Pennsylvania Coal Co. *v.* Sanderson.]

practically a condition upon which the ordinary use and enjoyment of coal lands depends; the discharge of the water is therefore part and parcel of the process of mining, and as it can only be effected through natural channels, the denial of this right must inevitably produce results of a most serious character to this, the leading industrial interest of the state.

The defendants were engaged in a perfectly lawful business, in which they had made large expenditures, and in which the interests of the entire community were concerned; they were at liberty to carry on that business in the ordinary way, and were not, while so doing, accountable for consequences which they could not control; as the mining operations went on, the water by the mere force of gravity ran out of the drifts and found its way over the defendant's own land to the Meadow Brook. It is clear that for the consequences of this flow, which by the mere force of gravity, naturally, and without any fault of the defendants, carried the water into the brook and thence to the plaintiff's pond, there could be no responsibility as damages on the part of the defendants.

A person, in the lawful use of his own land, may cause to flow over the land of another a greater quantity of water than it is naturally subjected to. "I am aware," says WOODWARD, J., in Kauffman *v.* Griesemer, 2 Casey, 414, "that in Merrit *v.* Parker, 1 Coxe (N. J.) R., Chief Justice KINSEY, denied these principles, and held that by no contrivance and under no pretense can one man cause to flow over the land of another a greater quantity of water than it is naturally subjected to; but on the other hand there is a Maryland case of equal authority, Williams *v.* Gale, 3 H. & John R., 231, which, in its facts, bears a striking resemblance to the case at bar, and the case of Martin *v.* Riddle, decided by my brother LOWRIE, in the District Court of Allegheny county, and affirmed in the Supreme Court at September Term, 1848; these cases recognize the principle, that the superior owner may improve his lands by throwing increased waters upon his inferior, through the natural and customary channels, which is a most important principle in respect not only to agricultural, but to mining operations also."

It may be said that under the doctrine of Baird *v.* Williamson, 15 C. B., N. S., 376, when the flow of water is increased artificially or is greater than would result from gravitation alone, the mine owner who causes it is liable for the increased injury; that this may be termed a non-natural use of the land, and the mine owner would be held for any injury, which would be sustained in consequence of this artificial increase in the amount. We understand the rule of Baird *v.* Williamson to be this: Where coal may be successfully mined by tunnel or

[Pennsylvania Coal Co. *v.* Sanderson.]

drift, the owner of the land may be deemed to have the natural use and enjoyment of it in that form of mining, and he will in such a case not be allowed to add merely to the efficiency of his enterprise, to the injury of his neighbor's land, by the artificial accumulation of water in large quantities through the use of powerful engines and pumps.

But it does not appear from any evidence in this cause, that the mine was conducted by the defendant, in any but the ordinary and usual mode of mining in this country. The deeper strata can only be reached by shaft, and no shaft can be worked until the water is withdrawn. A drift is in some sense an artificial opening in the land and accumulates and discharges water in a greater volume and extent, than would otherwise result from purely natural causes, yet mining by drift has, as we have seen, been held to be a natural user of the land. So, too, we think, according to the present practice of mining, the working of the lower strata by shaft, in the usual and ordinary way, must be considered the natural user of the land, for the taking out of the coal, which can be reached by shaft only; and, as the water cannot be discharged by gravity alone, it must necessarily, as part of the process of mining, be lifted to the surface by artificial means, and thence be discharged through the ordinary natural channels for the drainage of the country.

But if we should be wrong as to the water which was pumped out of the mine, how can we discriminate as to the effect of the water which flowed from the mine by mere gravity and that which was pumped out? The witnesses did not discriminate in their testimony, and the learned Court did not instruct the jury to make any discrimination. The injury done to the plaintiff was estimated without any effort to distinguish between the effects of the water from one or other of these sources. If the stream was already corrupted by the water which flowed from the tunnels, or if that water was sufficient of itself to corrupt it, so as to render it useless for domestic purposes, the water which was pumped as an independent cause of action, would occasion an injury without damage. The pollution of a clear stream might inflict an injury for which damages would be recoverable, but we cannot see how damages could be estimated for the pollution of a stream which had already become foul from other causes, for which the law gave no remedy.

It is said the defendants created an artificial water-course from their mine to Meadow Brook, but this artificial water-course was upon their own land, and conducted no more water to the brook than, by the natural conformation of the surface, could otherwise have reached it. If it be suggested

[Pennsylvania Coal Co. v. Sanderson.]

that the defendants might have extended this artificial water way, in form of a sewer, to some point of safety, it may be asked where, short of the sea, might the sewer be discharged that the same complaint might not be made?

We do not say that a case may not arise in which a stream, from such pollution may not become a nuisance, and that the public interests, as involved in the general health and well being of the community may not require the abatement of that nuisance. This is not such a case; it is shown that the community in and around the city of Scranton, including the complainant, is supplied with abundant pure water from other sources; there is no complaint as to any injurious effects from this water to the general health; the community does not complain on any grounds. The plaintiff's grievance, is for a mere personal inconvenience, and we are of opinion that mere private personal inconvenience, arising in this way and under such circumstances, must yield to the necessities of a great public industry, which although in the hands of a private corporation, subserves a great public interest. To encourage the development of the great natural resources of a country, trifling inconveniences to particular persons must sometimes give way to the necessities of a great community.

Nor do we say, that a miner, in order that his mines may be made available, may enter upon his neighbor's lands, or inflict upon him any other immediate or direct injury, but we do say, that in the operation of mining, in the ordinary and usual manner, he may upon his own lands, lead the water which percolates into his mine, into the streams which form the natural drainage of the basin, in which the coal is situate, although the quantity as well as the quality of the water in the stream may thereby be affected.

In the previous disposition of this case in this court, as reported in 5 Norris, 401, the principle of law mainly relied upon was stated as follows: "If a man brings or uses a thing of a dangerous nature on his own land, he must keep it at his own peril, and is liable for the consequences if it escapes and does injury to another:' Jones v. Festinlog, L. R., 3 Q. B., 736. "The person whose grass or corn is eaten down by the escaping cattle of his neighbor, or whose mine is flooded by the water from his neighbor's reservoir (Harrison v. Great Northwestern Railroad Company, 3 H. & C., 238), or whose habitation is made unhealthy by the fumes and noisome vapors of his neighbor's alkali works (St. Helen's Smelting Company v. Tipping, 11 H. L. Cas., 642), is damnified without any fault of his own, and it seems but reasonable and just that the neighbor who has brought something on his own property which was not naturally there, harmless to others, so long as

[Pennsylvania Coal Co. v. Sanderson.]

it was confined to his own property, but which he knows will be mischievous if it gets on his neighbor's should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property: Fletcher v. Rylands, L. R., 1 Ex., 280."

The parenthetic references to authorities are not found in the opinion in Fletcher v. Rylands, but were inserted in the body of the quotation by Mr. Justice WOODWARD, who delivered the opinion of this court.

The doctrine declared in Fletcher v. Rylands, regarded as a general statement of the law, is perhaps not open to criticism in England, but it is subject to many and obvious exceptions there and has not been generally received in this country. A rule which casts upon an innocent person the responsibility of an insurer is a hard one at the best, and will not be generally applied unless required by some public policy, or the contract of the parties. The later decisions in the English Courts, seem to encourage rather than to discourage exceptions to it. But we regard the rule in Fletcher v. Rylands as wholly inapplicable to the case under consideration. Referring to the judgment we find the facts of that case to have been as follows: The plaintiff was damaged by his property being flooded with water, which without any fault on his part, broke out of a reservoir, constructed and maintained on the defendant's land, by the defendant's orders. The coal under the defendant's land had, at some remote period been worked out, but this was unknown at the time the defendants gave directions to erect the reservoir. Although the persons employed did not in fact use proper care and skill to provide for the sufficiency of the reservoir, with reference to these old shafts, the defendants were personally free from all blame. The consequence was that the reservoir, when filled with water, burst into the shafts; the water flowed down through them into the old workings and thence into the plaintiff's mine, and there did the mischief. "We think that the true rule of law is," says BLACKBURN, J., "that the person who for his own purposes brings on his lands and collects and keeps there anything likely to do mischief, if it escapes, must keep it in at his peril, and if he does not do so, is *prima facie* answerable for all the damage which is the natural consequence of its escape. He can excuse himself by showing that the escape was owing to the plaintiff's default; or perhaps that the escape was the consequence of *vis major*, or the act of God; but as nothing of this sort exists here, it is unnecessary to inquire what excuse would be sufficient. The general rule, as above stated, seems on principle just."

Then follows the clause which we find quoted in the opinion of Mr. Justice WOODWARD.

But the defendants, in the case at bar, brought nothing upon the land; they accumulated nothing there; the water was there without any act of theirs, and it was the accumulation of it which they sought to prevent. They were in the natural user of their lands for a lawful purpose, and the discharge of the mine water was an absolute necessity in order to that use of the land. The distinction is obvious, and we cannot see how Fletcher v. Rylands can be supposed to have any application in the consideration of this case.

The case was taken to the House of Lords on a proceeding in error against the judgment of the Exchequer Chamber, which had reversed the judgment of the Court of Exchequer; the judgment was there affirmed (Rylands v. Fletcher, L. R., 3 H. L., 330) and the general legal proposition, involved in the case thus stated by Lord CRANWORTH:—"If a person brings or accumulates on his land anything, which if it should escape, may cause damage to his neighbor, he does so at his peril. If it does escape and cause damage he is responsible, however careful he may have been, and whatever precautions he may have taken to prevent damage."

But the very distinction we have endeavored to point out, between that case and this, was suggested in the judgment of the House of Lords, in the case referred to. Lord CAIRNS says:—"The defendants might lawfully have used that close for any purpose for which it might in the ordinary course of the employment of land be used, and if in what I may term the natural user of that land there had been any accumulation of water, either on the surface or underground, and if, by the operation of the laws of nature, that accumulation of water had passed off into the close occupied by the plaintiff, the plaintiff could not have complained that the result had taken place." A line was thus drawn between the rule recognized in the case adjudged, and the general immunity which the law extends to land owners for acts done in the natural and lawful user of their land. In the first head note, of the case as reported in L. R., 3 H. L., 330, the general legal proposition, embodied in the judgment of the House of Lords is thus stated:—"Where the owner of land, without wilfulness or negligence, uses his land, in the ordinary manner of its use, though mischief should thereby be occasioned to his neighbor, he will not be liable for damages." Thus it seems that the liability, even under the ruling of Rylands v. Fletcher, is rested on the manifestly hazardous state of things artificially maintained on the land, and not on the natural user of it.

As we have said, even in England the later decisions favor

exceptions to the rule of Rylands v. Fletcher; thus in Nichols v. Marsland, L. R., 10 Exch., 255, the defendant was an owner of artificial pools, formed by damming a natural stream, into which the water was finally let off by a system of weirs. The rainfall accompanying an extremely violent thunderstorm broke the embankments, and the rush of water down the stream carried away four county bridges, in respect of which the action was brought. It was held that the rule referred to did not apply, in the operation of natural forces so violent and unexpected that human foresight could not have been reasonably expected to anticipate it. So it has been held not to apply, where the immediate cause of the damage is the act of a stranger : (Box v. Jubb, 4 Exch. Div., 76) nor when the artificial construction is maintained for the common benefit, and the immediate cause of the injury of such a trivial character as to have been wholly unexpected : (Carstairs v. Taylor, L. R., 6 Exch., 217,) or in the exercise of powers specially conferred by law : (Madras Ry. Co. v. Zeminder, etc., L. R., 1 Ind. App., 364.

The principle of Rylands v. Fletcher was again enforced by the Court of Exchequer in Smith v. Fletcher, L. R., 7 Ex., 305, a case referred to in the argument of counsel, growing out of injury from the same premises; the case was carried up, however, to the Exchequer Chamber; where the judges thought that under the circumstances of the case, evidence might have been received to show that every reasonable precaution had been taken to guard against ordinary emergencies; and that it was desirable the opinion of the jury should be taken as to whether the acts of the defendants were done in the ordinary, reasonable and proper mode of working the mine. It is not altogether clear, therefore, since the decision in this case in the Exchequer Chamber, what the English doctrine is as to cases which are not strictly like Rylands v. Fletcher.

Nor has the doctrine of Rylands v. Fletcher been generally received in this country; it has been cited with approval in Massachusetts : (Shipley v. Fifty Associates, 106 Mass., 194; Gorham v. Gross, 125 Mass., 232; Mears v. Dole, 135 Mass., 508;) but it has been expressly denied in New York : (Loßee v. Buchanan, 51 N. Y., 477;) in New Jersey : (Marshall v. Welwood, 38 N. J. Law, 339;) and in New Hampshire; Sweet v. Cutts, 50 N. H., 439; Garland v. Towne, 55 N. H., 57.) In Loßee v. Buchanan, Earl C. says, it is sufficient, however, to say that the law as laid down in these cases (Ryland v. Fletcher, and Smith v. Fletcher) is in direct conflict with the law as settled in this country. "Here, if one builds a dam upon his own premises and thus holds back and accumu-

lates the water for his benefit, or if he brings water upon his premises into a reservoir, in case the dam or the banks of the reservoir give away and the lands of a neighbor are thus flooded he is not liable for the damage without proof of some fault or negligence on his part: (Angell on Water-courses, sec. 336; Tapman v. Curtis, 5 Vt., 371; Todd v. Cochell, 17 Cal., 97; Everett v. Hydraulic, etc., Co., 23 Id., 225; Shrewsbury v. Smith, 12 Cushing, 177; Livingston v. Adams, 8 Cowen, 175; Bailey v. Mayor, etc., of New York, 3 Hill, 531; S. C., 2 Denio, 433; Pixley v. Clark, 35 N. Y., 520, 524; Sheldon v. Sherman, 42 Id., 484.

" The true rule is laid down in the case of Livingston v. Adams as follows: " Where one builds a mill-dam upon a proper model, and the work is well and substantially done, he is not liable to an action though it break away, in consequence of which his neighbor's dam and mill below are destroyed. Negligence should be shown in order to make him liable."

In Marshall v. Welwood, BEASLEY, C. J. says:—" The fallacy in the process of argument by which judgment is reached in the case of Fletcher v. Rylands, appears to me to consist in this: that the rule, mainly applicable to a class of cases, which I think should be regarded as in a great degree exceptional, is amplified and extended into a general if not universal principle."

In Garland v. Towne, LADD, J., referring to the case of Rylands v. Fletcher, says: " I am not aware that any Court this side of the Atlantic has gone so far as this, and I apprehend it would be a surprise not only to that large class of our people engaged in various manufacturing operations, who use water power to propel their machinery and for that purpose maintain reservoirs, but to the legal profession, to hold that in case of the breaking away of such reservoirs, there is no question of care or negligence to be tried, but that he who has thus accumulated water in a non-natural state, on his own premises, is liable, at all events as matter of law, in case it escapes, for the damage caused by it.  As a general proposition, it is safe to say that the owner of land has a right to make reasonable use of his property, and that right extends as well to an unlimited distance above the earth's surface as to an unlimited distance below."

See also Wh. Neg., 934, Angell on Watercourses, 336; Washburn on Easements, ch. 3, § 7; Jones v. R. R. Co., 27 Vt., 399.

If a man erect a mill upon a stream of water, and build a dam wholly upon his own land in order to apply the weight and power of the water to the propelling of his mill; or if he erect tanks or basins to retain water, for the irrigation of his land, it seems a severe rule, to put upon him the strict and un-

bending obligation of an insurer; to hold him liable for any injury whatever which may result from the escape of the water, whether in the construction and maintenance of the works, he was negligent or not.

As a general rule those who engage in an undertaking attended with risks to their neighbors, are answerable for the conduct of that undertaking, with diligence, proportioned to the apparent risk, and this would seem to be the better rule. Where one places a steam boiler upon his premises, and operates the same with care and skill, so that it is no nuisance, in the absence of proof of fault or negligence upon his part, he is not liable for damages to his neighbor, occasioned by the explosion of his boiler: Lofee *v.* Buchanan, *supra.* A railway company may bring upon its lands locomotive engines, and if notwithstanding the best practicable care and caution, and the use of the best approved appliances, sparks escape and fire the property of the adjacent land owners, the company will not be held for the consequences. So with fires necessarily employed in the clearing of land, and for domestic purposes; in the accumulation of materials for building of dwelling houses, or other necessary structures on the land, for the enjoyment thereof.

In the first place, then, we do not regard the rule in Rylands *v.* Fletcher, as having any application to a case of this kind; and if it had, we are unwilling to recognize the arbitrary and absolute rule of responsibility it declares, to the full extent, at least, to which its general statement would necessarily lead.

The case of Mason *v.* Hill, 5 B. & A., 11, is in no respect inconsistent with the view we have expressed, and we cannot see how it can be supposed to have any important bearing on the case.

The only case cited by the defendants in error, which would seem to sustain their view of this case, is the rather recent case of Pennington *v.* Brinsop Coal Co., L. R., 5 Ch. Div., 769, where an injunction was granted to restrain the coal company from pumping water from their colliery into Borsdane Brook, by means whereof the water used in the plaintiff's cotton mill was corrupted. The claim in that case, however, included the distinct assertion by the plaintiff of a prescriptive right to the use of the water for the supply of his boilers, and for the other purposes of the mill, in its natural purity. That the plaintiff had all the rights of a riparian owner, and also a right by prescription, was conceded. Upon this the Court granted an injunction. What the plaintiff's rights as a riparian owner were was not separately discussed in the judgment of the Court; indeed, that question was not discussed at all, and

cannot be said to have been decided; because, as we have said, the defendant conceded the prescriptive right. The opinion of the Court (FRY, J.), is wholly occupied with the discussion of a question which is irrelevant here, whether, where the right is conceded, damages might or should be awarded in lieu of the injunction. As the question now under consideration was neither discussed or decided, we cannot see how the case can be supposed to have any importance here. If it be assumed, however, that it was decided upon the plaintiff's rights as a riparian owner alone, we think the case was not well considered. The authorities cited by the learned Judge, in that view, certainly do not sustain him.

There is a well known line of cases in Pennsylvania and elsewhere, which decide that a stream of water may not be fouled, by the introduction into it of any foreign substance, to the damage and injury of the lower riparian owners: Howell *v.* McCoy, 3 Rawle, 256; Barclay *v.* Commonwealth, 1 Casey, 503; McCallum *v.* Germantown Water Company, 4 P. F. S., 40; Wood *v.* Sutcliffe, 16 Jur., 75; Wood *v.* Waud, 3 Ex., 748; St. Helen Smelting Co. *v.* Tipping, 4 B. & S., 608; 11 H. L., 642; are cases of this kind. But we do not understand the principle of these cases to be denied. And we think they are not pertinent to the question now under consideration. The defendants introduced nothing into the water, to corrupt it; the water flowed into Meadow Brook just as it was found in the mine; its impurities were from natural and not from artificial causes.

It may be said, that if the mines had not been opened, the water which flowed into the stream would have been pure, but as Chief Justice LEWIS said, in Wheatley *v.* Baugh, 1 Casey, 532, "the law has never gone so far as to recognize in one man the right to convert another's farm to his own use for the purpose of a filter."

In the case of the New Boston Coal Company *v.* Pottsville Water Co., 54 Penn. St., 164, a question of somewhat similar nature was sought to be raised in this Court, but the cause was determined on other grounds, and the question referred to was not decided. No case in Pennsylvania has been brought to our notice, in which the precise question appears to have been decided.

As the discharge of mine water is incident to all mining, it is probable that there is scarcely a stream in the mining regions of Lackawanna county, which is not to a greater or less extent similarly affected; but, adopting the language of our brother PAXSON, in his dissenting opinion (6 W. N. C., 101): "The population, wealth and improvements are the result of mining, and of that alone. The plaintiffs knew, when

[Pennsylvania Coal Co. *v.* Sanderson.]

they purchased their property, that they were in a mining region; they were in a city born of mining operations, and which had become rich and populous as the result thereof. They knew that all mountain streams in that section were affected by mine water, or were liable to be. Having enjoyed the advantages which coal mining confers, I see no great hardship, nor any violence to equity, in their also accepting the inconvenience necessarily resulting from the business."

We are of opinion, for the reasons stated, this judgment should be reversed. It is with the greatest reluctance we conclude to revise and reverse a former judgment of this Court. We feel much more embarrassed, in so doing, because of the well known learning and ability of the learned judge who delivered the previous opinion, and of the fact that two at least of our number have given that opinion their formal approval; but a majority of this Court, as it is now constituted, satisfied that the rule laid down in that opinion and judgment is a wrong one, feel constrained to adopt a different rule and enter a different judgment.

The view which we have taken of this case renders it unnecessary that we should consider the other errors assigned.

The judgment is reversed.

MERCUR, C. J., GORDON, and TRUNKEY, JJ., dissent.

There have been four writs of error in this case. Mr. Justice WOODWARD delivered the opinion of the Court on the first writ of error, which is reported in 5 Norris, 401. Mr. Justice PAXSON at that time filed a dissenting opinion. Mr. Justice GORDON delivered the opinion of the Court on the second writ of error, which is reported in 13 Norris, 302. Mr. Justice PAXSON and Mr. Justice STERRETT dissented. Mr. Justice TRUNKEY delivered the opinion of the Court on the third writ of error, which is reported in 6 Out., 370.

Dissenting opinion of Mr. Justice PAXSON on the first writ of error:

"This case involves a question of vast importance to the mining interests of Pennsylvania, and a careful consideration of it has led me to a different conclusion from that adopted by the majority of the Court. In an ordinary case it would be sufficient to announce my dissent without more; but the principle decided being one of the first impression, and so far-reaching in its consequences, I desire to place upon record the reasons which have compelled me to differ from my brethren.

The plaintiffs are the owners of a tract of land within the limits of the city of Scranton, upon which they have erected a handsome residence and other improvements.

It was supplied with water by a mountain stream for culinary and bathing purposes, as well as for a fish-pond, located in the grounds attached to the house. Some time after the completion of the improvements, the defendants opened a coal mine about three miles up the stream and near its head. In opening said mine a drift was made out of which the water flowed without the application of machinery, and following the law of gravity, found its way into the stream of plaintiffs. Soon after this the fish in the pond died, the pipes in plaintiff's house corroded, and the water became unfit for domestic purposes. No analysis was furnished of the water, but it was conceded that it became acid and unfit for use, although perfectly clear, and to the eye unchanged. The Court below, having nonsuited the plaintiffs, it must be assumed that the mine water was the cause of the injury. Under this state of facts were the plaintiffs entitled to recover damages? The Court below held that they were not, which ruling the majority of this Court decided to be error.

It is a fact not without significance, that this question has never before been decided in Pennsylvania. For a period of about fifty years mining operations have been carried on here, increasing in extent yearly, until it has become the overshadowing interest of the Commonwealth, and there is now hardly a mountain stream in the mining region that is not affected just as the plaintiff's stream was. That no riparian owner has complained before, goes far to establish the fact that the common sense and the common judgment of the people of those regions were against such an assumption.

It is true the question was raised in the single case of The New Boston Coal and Mining Company v. The Pottsville Water Company, 4 P. F. S., 164, in which the water company sought to enjoin the coal company from pumping their mine water into the stream.

The Court in that case refused the injunction on other grounds and left the main question undisposed of.

The plaintiffs rely upon a class of cases which, while they are admitted law, have no application to the case at bar, such as Howell v. McCoy, 3 Rawle, 256; Wheatley v. Chrisman, 12 Harris, 298, and McCallum v. The Germantown Water Company, 4 P. F. S., 40, in each of which the water had been fouled by the admixture of dye-stuffs, or some other injurious substance. The only case cited by the plaintiffs, which seemingly sustains them, is Pennington v. Brinsop Hall Coal Company, L. R., 5, Chancery Div., 769.

This is an English case, and not authority here. Nor is there any thing in the decision to commend it to favor. It was not a well considered case, was decided by a single judge,

and the few authorities he cites do not sustain him. He evidently decided it upon the ground of fouling the water, and had in his mind the line of English decisions bearing upon the question raised in our own case of McCallum *v.* Water Company, *supra*. The facts are not fully given, and it is quite possible they may have justified his ruling. There is nothing in his opinion to indicate that his mind grasped the broad question involved in this case. Nor do I regard English cases as safe precedents upon such a question. They are influenced to some extent by the social and political conditions of the country. The mines in England are generally located in highly-improved sections, where the land possesses great intrinsic value, and the streams are filled with choice fish, the sole right to which is in the nobility and landed gentry. Under such circumstances we could hardly expect the English judges to lay down a rule suited to the rough mountain lands, which in the main constitute the mining regions of Pennsylvania. We must not overlook the further fact that in England the costly improvements of the country antedate mining operations in many instances for centuries, while here, for the most part, the mining region was a wilderness at the commencement of mining operations. The population, wealth and improvements are the result of mining, and of that alone. The plaintiffs knew, when they purchased their property, that they were in a mining region; they were in a city born of mining operations, and which had become rich and populous as a result thereof. They knew that all the mountain streams in that section were affected by mine water, or were liable to be. Having enjoyed the advantages which coal mining confers, I see no great hardship, nor any violence to equity, in their also accepting the inconvenience necessarily resulting from the business.

It was not alleged, nor is there any proof, that the defendants did anything to foul the water. It flowed from the drift just as it fell from the clouds, excepting in so far as it had been affected by the coal and other mineral substances with which it came in contact after percolating through the surface soil. It was also a natural flow of water. It is true, some of it was pumped out, generally at night, but this was after the injury of which the plaintiffs complain was done. There was no distinction, however, as to the character of the water flowing from the drift and that which was pumped out at the shaft.

While there is no decided case in Pennsylvania which rules this question, there are certain principles which may be considered as settled that have a direct bearing upon it. It must be conceded, the defendants have a right to mine their coal.

It is equally clear that they have a right to free their mine from water, by pumping, if necessary. Without it, no mine can be operated for any considerable length of time. A man may use and enjoy his own property in a lawful manner, and if in doing so without negligence, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria*. If in excavating my land for a lawful purpose, as in digging a cellar or opening a quarry, I strike a spring, which flows out over the lower land of my neighbor, I am no more responsible for such flow than if the water had fallen from the clouds upon my land and then ran off upon his. There is no principle of natural law better settled than that water will seek its level according to the law of gravity. There is no rule of human law more firmly established than the principle incorporated into the jurisprudence of all civilized nations, that the water which falls upon the earth, or comes out of its bosom from springs, must follow its natural channel. Hence no Court has ever decided that the owner of mountain lands was responsible for the torrents which at times pour down the mountain sides, to the devastation of the plain below. In towns and cities the rule is different. They have, as a general rule, no natural drainage. It is all artificial. Of course, in cities, a man may not throw the water from his roof upon his neighbor's roof or yard. In this the law is but common sense, or, as Blackstone puts it, "the perfection of reason."

As before remarked, the defendants had a right to work their mine to pump out the water therein. The right to work mines is a right of property, which, when duly exercised, begets no responsibility. Wilson v. Waddell, L. R., 2 App. Cas., 95. It is also settled that the disturbance or destruction of subterranean springs, or streams in a proper course of mining, is not a ground of action : Trout v. McDonald, 2 Norris, 144. In Wheatley v. Baugh, 1 Casey, 528, it was held that where a spring depends for a supply upon percolations through the land of the owner above, and, in the use of the land for mining or other lawful purposes, the spring is destroyed, such owner is not liable for the damages thus done, unless the injury was occasioned by malice or negligence. Says LEWIS, C. J., at page 532: "Percolations spread in every direction through the earth, and it is impossible to avoid disturbing them without relinquishing the necessary enjoyment of the land. Accordingly, the law has never gone so far as to recognize in one man the right to convert another's farm to his own use for the purpose of a filter. The Roman law, founded on enlightened consideration of the right of property, declared that he who in making a new work upon his own estate, uses his right without trespassing either against any law, custom, title or posses-

sion which may subject him to any service towards his neighbors, is not answerable for the damages which they may chance to sustain thereby, unless it be that he made that change merely with a view to hurt others without any advantage to himself." Again, at page 535, "In conducting extensive mining operations, it is, in general, impossible to prevent the flow of subterranean waters through the interstices in which they have usually passed, and many springs must be necessarily destroyed in order that the proprietors of valuable minerals may enjoy their own. The public interest is greatly promoted by protecting this right, and it is just that the imperfect right and lesser advantage should give place to that which is perfect, and infinitely the most beneficial to individuals and the community in general." So, if in sinking a well upon one's own land it destroys the well of his neighbor, it is *damnum absque injuria:* Washburne on Easements, 369; Angell on Watercourses, 183; Frazier *v.* Brown, 12 Ohio St., 294; Roath *v.* Driscoll, 20 Conn., 533. It is clear, under the authorities in this state and elsewhere, that if the defendants, in proper course of mining, had destroyed the subterranean springs which supply the plaintiff's stream, and thus destroyed the stream itself, it would have been a loss for which they would not have been entitled to damages, while Kauffman *v.* Griesemer, 2 Casey, 407, and Martin *v.* Riddle, Id., 415, distinctly recognize the principle, that in favor of agricultural and mining operations, the volume of the water may be increased by the owner of the upper or superior heritage, and thrown upon the lower or subservient heritage by its natural or accustomed channels. The plaintiffs have no cause to complain of the increased volume of water. In fact, they do not complain of such increase. They object to nothing but the change in the character and quality of the water. Are they entitled to recover damages for this? I would answer this question affirmatively if the defendants had fouled the water which is discharged from their mine. But, as before said, they have not. They pump it out or allow it to flow from the mine without any admixture of any kind. As Nature created it so they discharge it, leaving it to seek its natural channel. The answer is found in Prescott *v.* Williams, 5 Metc., 429, recognized in Kauffman *v.* Griesemer, *supra.* Because water is descendible by nature, the owner of a dominant or superior heritage has an easement in the servient or inferior tenements for the discharge of all waters which by nature rise in, or flow or fall upon the surface. Hence, the owner of a mill has an easement in the land below, for the free passage of the water from the mill, in the natural channel of the stream, accompanied with a right to enter upon the land for the pur-

[Pennsylvania Coal Co. v. Sanderson.]

pose of cleaning out the stream and removing obstructions to the free flow of the water. This decision is undoubted law. In terms it applies to all waters which by nature rise in, or flow or fall upon the surface. It applies with equal force to such subterranean springs in a man's land as, in the pursuit of his lawful use of his land, are brought to the surface. They then rise in his land and flow upon the surface. In such case it is beyond his control. Water is said to be a common enemy. It passes from the superior to the servient heritage, and so on by the irresistible law of gravity, to the ocean, where it finds its level. Each riparian owner has the use of it, but no right of property beyond the use. It literally has no owner.

If damages are to be recovered from the mere flow of water, where no act has been done to change its character or diminish its purity, it is manifest that results of a serious character must follow to the mining and other industrial interests of the country. If the plaintiffs have a right to recover in this suit, they have a right, under all the authorities, to an injunction to restrain the defendants from the pumping, or even permitting the flow of water for the future. Such an injunction might be effective, at the cost of the destruction of the mine, so far as the pumping is concerned, but how the defendants are to stop the natural flow from the drift is not clear to my mind.

The argument that it might have been carried into the Lackawanna or some other stream by a tunnel is without force, for the reason that the riparian owners upon those streams would have the same right to object that the plaintiffs have—nay more, they would have the clear right to enjoin against conveying the water out of its natural channel to their hurt.

If a Court of Equity should refuse to grant an injunction against the defendants to restrain the flow of the mine water for the future, the same result (stoppage of the mine) can be compelled by the common-law action of case for a nuisance. A recovery in the present action would be no bar to a subsequent suit for continuing the flow of water; and if the first verdict should be for a nominal sum, the second and subsequent verdicts would be such as to empty the cash box of any coal company, and make mining practically impossible. For in such cases the jury would be instructed to give such damages as would punish the defendants, and secure the abatement of the nuisance. Of the readiness of a jury to comply with such instructions I entertain no doubt.

What has been said as to the plaintiffs is true as to every other riparian owner in the mining region. The former have no rights that are not common to all. They have made a dif-

3 AMERMAN—11

[Taylor *v.* Delaware & Hudson Canal Co.]

ferent use of the water and have been more inconvenienced by reason thereof. But that does not affect the principle. If the flow of mine water is an injury for which the owner of the mine is responsible in damages, I am unable to see how such mines can be operated in the future, except by the consent of the riparian owners. It is impossible, under any system of government, or any code of laws, that equal and exact justice should be meted out in all cases. Under no state of society, save the savage, can a man enjoy all his natural rights. He is compelled to relinquish a portion of them for the common good. There are many instances in which the prosecution of a man's lawful business occasions annoyance and loss to some one. The law compels compensation for some ; others, if unaccompanied with negligence, it regards as *damnum absque injuria*. The distinction between the two classes of cases is very narrow, and it sometimes requires the highest order of wisdom to properly define it. In the present case I think a broader view might have been taken of the question under discussion, which would have been entirely in harmony with well-settled principles of law. The trifling inconvenience to particular persons must sometimes give way to the necessities of a great community. Especially is this true where the leading industrial interest of the state is involved, the prosperity of which affects every household in the Commonwealth.