## Sanderson *versus* The Pennsylvania Coal Company.

| 86   401 |
| 113   155 |

1. The invasion of an established right will in general *per se* constitute an injury for which damages are recoverable, for in all civil acts the intent of the actor is less regarded than the consequences to the party suffering. However laudable industry may be, its managers are still subject to the rule that their property cannot be so used as to inflict injury on the property of others.

2. To render a particular case an exception to the general principles controlling the exercise of dominion over property by its proprietor, it must be ascertained to be exceptional in its surroundings or its facts. Except where it is qualified by the existence of peculiar conditions, the duty of the owner of property is defined by the maxim "*Sic utere tuo ut alienum non lœdas.*"

3. S. purchased a tract of land in the coal regions, upon which he erected a handsome residence. One of the principal inducements to the purchase was that a stream of pure mountain water ran through the tract, and a number of valuable improvements were made in order that the residence and grounds might be supplied with water for culinary, bathing and other purposes. Shortly after these improvements were completed a mine was opened by defendant on the stream about two miles above the land of S., the water from which when pumped or flowing naturally therefrom ran into the stream and so polluted it as to render the water unfit for any of the uses to which S. had adapted it. Upon the above facts the court below entered a nonsuit, on the ground that in the absence of negligence or malice this was *damnum absque injuria*. *Held*, that S. had a right of action and the case should have been submitted to a jury.

4. The exigencies, however, of the great industrial interests must be kept standing in view; the properties of large and useful interests should not be hampered or hindered for frivolous or trifling causes. For slight inconveniences or occasional annoyances, they ought not to be held responsible, and in dealing with such complaints, juries should be held with a steady hand.

March 11th 1878. Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON, WOODWARD and TRUNKEY, JJ.

Error to the Court of Common Pleas of *Luzerne county:* Of January Term 1878, No. 258.

Trespass on the case by J. Gardner Sanderson and wife, in right of the wife, against the Pennsylvania Coal Company, for damages for the alleged corruption of a stream by reason of the working of the colliery of defendants.

In 1868 the plaintiffs purchased a tract of land which is within the limits of the city of Scranton, on which they erected a handsome residence and other valuable improvements. A stream of water, called "Meadow Brook," runs through this tract, and before its purchase Mr. Sanderson traced it to its source, and it appeared that the existence of this stream was one of the principal inducements to the purchase of the land. This stream was about an average width from its source to the house of plaintiffs. When traced by Mr. Sanderson the water was perfectly pure. Dams were built across the stream for the purpose of fish and ice ponds and to supply a cistern, and the water was carried in pipes from the cistern to a ram and thence forced to a tank in the attic of the house. After these improvements had been made the defendants opened a

5 NORRIS—26

coal mine on the side of a hill about three miles above the house of plaintiffs. A drift was first made into this mine, and a shaft afterwards sunk. The water which collected in this drift, as well as that pumped by engines from the shaft, ran into the creek. The water from the drift, following the law of gravitation, naturally flowed into the stream. It was shown that the effect of this was that the water of the stream was so corrupted that the fish in the pond were destroyed; that the willows along the bank died; that the pipes carrying the water were corroded and eaten out; that the water was unfit for domestic use, and that finally its use had to be abandoned for every purpose. No analysis was furnished of the water, but it was conceded that it was acid and unfit for use, although unchanged in appearance. It appeared that mine-water is usually impregnated with acid. Upon the above facts, the court, Stanton, J., entered a compulsory nonsuit, on the ground that there appearing to be no negligence or malice, and the discharge of the mine-water being necessary in mining, was *damnum absque injuria.*

This action was assigned for error by plaintiffs, who took this writ.

*A. Ricketts,* for plaintiff in error.—The plaintiffs did not claim an easement in defendant's land, but damages simply for the destruction of a surface stream of which they were the riparian owners, and in which they had a clear right of private property. That they had the right to have the water of the stream come to their land uncorrupted is the undoubted law of this state : Howell *et al. v.* McCoy, 3 Rawle 256 ; McCollum *v.* The Germantown Water Co., 4 P. F. Smith 40. And their right is not subject to the convenience or necessity of defendants: Wheatley *v.* Chrisman, 12 Casey 278. In England such pollution of a stream is distinctly declared to be both injury and damage : Pennington *v.* Brinsop Hall Coal Co., 5 Ch. Div. 769, where an injunction was granted. It is novel doctrine that because it is necessary in mining coal to get rid of mine water the party mining may pump it out as he pleases, without responsibility for injury to neighboring property. Such doctrine would be destructive of a large portion of private property in the mining regions.

*Henry M. Hoyt* and *Andrew T. McClintock,* for defendants in error.—There are in the anthracite region alone more than a thousand collieries, in which the mining of coal must and can only be carried on by pumping the water that percolates into the mine. Wherever coal is mined, whether by tunnel, slope or shaft, water accumulates, and must flow from the mine or be pumped therefrom to the surface ; and when brought to the surface must find its way by natural flow to the streams on the surface.

The question then arises whether the lawful use of property by

[Sanderson v. The Pennsylvania Coal Co.]

the owner, in opening mines on his own property, renders him liable to a riparian owner, whose property is some two or three miles below on the river, for any injurious effect of mine water from a drift upon the stream into which such water naturally flows, and although the owner of the mine does nothing to affect the water flowing therefrom, and it comes as in a state of nature from the mine.

The numerous cases relating to the right of a riparian owner to a reasonable use of water flowing through his land do not meet our case; nor are the cases applicable that relate to the fouling of water by the introduction into a stream of deleterious substances, arising from offensive ingredients used in manufactories or other operations.    Mining coal has been carried on in our state for over fifty years, and mine-water has been flowing from coal mines into the Schuylkill, the Lackawanna, the Susquehanna, the Lehigh rivers, and into their numerous large and small tributaries, for all those years.    And yet no case, except that of the New Boston Coal Co. v. Pottsville Water Co., 4 P. F. Smith 164, has arisen involving the question now under consideration; and in that case the point now at issue was not decided.    Cases, however, in which strong analogies are found have been considered and decided in England, and in many of the United States : Washburne on Easements 369, 370 ; Angell on Watercourses 183 ; Frazer v. Brown, 12 Ohio St. 294–312 ; Routh v. Driscoll, 20 Conn. 533 ; Smith v. Kenrick, 7 C. B. 515.

The rightful use of one's land may cause damage to another without any legal wrong : Haldeman v. Bruckhart, 9 Wright 514 ; Wheatley v. Baugh, 1 Casey 528 ; Wilson v. Waddell, L. R. 2 App. Cas. 95 ; Snow v. Persons, 28 Vt. 459 ; Chatfield v. Wilson, Id. 49 ; South Royalton Bank v. Suffolk Bank, 27 Id. 505 ; Mahon v. Brown, 13 Wendell 261 ; B. R. & A. Water and Mining Co. v. N. Y. Mining Co., 8 Cal. 327 ; Broadbent v. Ramsbothem, 11 Ex. 602 ; Acton v. Bloudell, 12 M. & W. 324 ; Chasemore v. Richards, 5 Hurl. & Norm. 982 ; Greenleaf v. Francis, 18 Pick. 117 ; New River Co. v. Johnson, 2 E. & E. 435 ; Kauffman v. Griesmer, 2 Casey 407 ; Martin v. Riddle, Ibid. 415. The case of Howell v. McCoy, and McCollum v. Germantown Water Co., cited by plaintiffs' counsel, are, like numerous other similar cases, where some extraneous ingredient is incorporated into the flow of water into the stream, by which the water is fouled.

The English case of Pennington v. Coal Company, was decided by a single judge, and was not a well-considered case.    It is not possible that in a state producing over twenty million tons of coal yearly, every ton of which must come from mines that discharge water and from which water must be discharged if the indispensable mineral is produced, it can seriously be said that this industry is liable to be crippled and endangered by injunction if the mine-water affects to any extent a stream into which it may naturally

[Sanderson *v.* The Pennsylvania Coal Co.]

flow when brought to the surface. The law must be adjusted to our great industrial interests; the right to mine coal is not a nuisance; the exercise of that right is lawful; and if in the exercise of such lawful rights streams of water, the natural courses for drainage, are affected by bringing to the surface the water that percolates into the mines, the riparian owner must submit to the incident; if he cannot claim damage for the spring or the well that is totally destroyed by mining adjoining lands, surely he is equally without redress for the effect of mine-water flowing into such stream and allowed to flow into the natural drain channel in the natural state in which it comes from the mines.

Mr. Justice WOODWARD delivered the opinion of the court, May 6th 1878.

In the year 1868 the plaintiffs purchased a tract of land in the city of Scranton, and began the erection of a house upon it, which was finished in the year 1870. Before the purchase a stream of water, which ran through the land, was examined by Mr. Sanderson, who traced it to its source. It appears from his testimony that the existence of this stream was a leading inducement to the plaintiffs to buy and build. It was called by some of the witnesses Meadow Brook, and was of an average width of perhaps seven feet throughout the distance from the house of the plaintiffs to the springs from which it flowed. Mr. Sanderson testified that when he traced it in 1868, the water was perfectly pure. Dams were built across it for the purposes of a fish and ice pond, and to supply a cistern. Water was carried in pipes from the cistern to a ram, and thence to a tank in the attic of the house.

After the improvements were completed the defendants established a colliery on lands belonging to them along the stream, and about two miles above the land of the plaintiff. A drift was first made into their mine, and a shaft was afterwards sunk. The water which collected in the drift, as well as that pumped by powerful engines from the shaft, ran into Meadow Brook, and was carried to its outlet in the Lackawanna river. It was alleged on the trial that the effect of the mine-water was to corrupt the water of the stream, and to render it worse than worthless for any domestic or household use. There was evidence that the fish in the brook were destroyed; that the willows along the banks died; that the pipes connecting it with the cistern, the ram and the house, were corroded and eaten out; that the water became unfit for domestic uses as early as 1873; and that its use for all purposes was abandoned in 1875. After the evidence of the plaintiffs had been given, it was held by the court to be inadequate to warrant or support a verdict, and a nonsuit was directed.

In the summary disposition that was made of the cause, sight appears to have been lost of some distinctions which the law has

settled, and a mistake seems to have been made in choosing the class of precedents that were followed.   The water in the mine of the defendants was in the ground before the colliery existed, but the drift and shaft collected it in such volume, and the mining operations made its ejection necessary in such a direction as to render what was harmless in its natural state a source of material discomfort, mischief and disaster.   Undoubtedly the defendants were engaged in a perfectly lawful business, in which large expenditures had been made, and with which wide-spread interests were connected.   But however laudable an industry may be, its managers are still subject to the rule that their property cannot be so used as to inflict injury on the property of their neighbors.  " Every man," Lord Truro observed, in Egerton v. Earl Brownlow, 4 H. L. C. 195, " is restricted against using his property to the prejudice of others."   The invasion of an established right will, in general, *per se*, constitute an injury for which damages are recoverable, for in all civil acts, the intent of the actor is less regarded than the consequences to the party suffering.  Thus, if a man lop a tree, and the boughs, *ipso invito*, fall upon another, or he shoot at a butt, and hit another unawares, an action lies.   So, one is liable who has land through which a river runs to turn his neighbor's mill, and lops the trees growing on the river side, and the loppings impede the progress of the stream, which hinders the mill from working : Broom's Leg. Max. 366, 367.   To render a particular case an exception to the general principles controlling the exercise of dominion over property by its proprietor, it must be ascertained to be exceptional in its surroundings or its facts.   From necessity the principles are sometimes relaxed.   They do not apply where it is impossible to gather safe facts to become bases for safe rules.  With respect to water flowing in a subterraneous course, it has been held that the owner of land through which it flows has no right or interest which will enable him to maintain an action against an owner who, in carrying on mining operations in his own land, in the usual manner, drains away the water from the other's land, and lays his well dry : Acton v. Blundell, 12 M. & W. 324.  Haldeman v. Bruckhart, 9 Wright 514, and Wheatley v. Baugh, 1 Casey 528, were ruled in the same way.   So, rights and liabilities in respect of artificial streams, when first flowing on the surface, are in some particulars distinct from those respecting natural streams so flowing.   They are distinct at least to the extent that the user of the easement of sending on the water of an artificial stream to the land of a neighbor, is no evidence that the land from which the water is sent has become subject to the servitude of being bound to send it on : Gaved v. Martin, 19 C. B. N. S. 758.  Perhaps Smith v. Kenrick, 7 C. B. 715, may be classed as an exceptional case also in its circumstances, although as a precedent it will probably prove of doubtful value.  It was held there that each of two owners

[Sanderson *v*. The Pennsylvania Coal Co.]

of adjoining mines has a natural right to work his own mine in the manner most convenient and beneficial to himself, although the natural consequence may be that some prejudice will accrue to the owner of the adjoining mine.

But except where it is qualified by the existence of peculiar conditions, the duty of the owner of property is defined by the maxim *sic utere tuo ut alienum non lœdas*. Can it be said, as a conclusion of law, that the duty of these defendants is qualified by such conditions? They created an artificial watercourse from their mine to Meadow Brook. The plaintiffs insisted that the act resulted in grave injury to them. Why ought not the jury to have been left to determine the truth or falsity of their allegation? It was declared in Gaved *v*. Martin, *supra*, that if the water in an artificial stream, when brought to the surface, is made to flow on the land of a neighbor without his consent, it is a wrong for which the party causing it so to flow is liable. If a man brings or uses a thing of a dangerous nature on his own land, he must keep it at his own peril, and is liable for the consequences if it escapes and does injury to another: Jones *v*. Festiniog, L. R. 3 Q. B. 736. "The person whose grass or corn is eaten down by the escaping cattle of his neighbor; or whose mine is flooded by the water from his neighbor's reservoir (Harrison *v*. Great North Western Railroad Co., 3 H. & C. 238), or whose habitation is made unhealthy by the fumes and noisome vapors of his neighbor's alkali works (St. Helen's Smelting Co. *v*. Tipping, 11 H. L. Cas. 642), is damnified without any fault of his own, and it seems but reasonable and just that the neighbor who has brought something on his own property which was not naturally there, harmless to others so long as it was confined to his own property, but which he knows will be mischievous if it gets on his neighbor's, should be obliged to make good the damage which ensues if he does not succeed in confining it to his own property;" Fletcher *v*. Rylands, L. R. 1 Ex. 280. In an elaborate and carefully considered opinion in Mason *v*. Hill, 5 B. & A. 1, Denman, C. J., held that the possessor of land through which a natural stream runs, has the right to the advantage of that stream flowing in its natural course, not inconsistent with a similar right in the proprietors of the land above and below; and that neither can any proprietor above diminish the quantity or injure the quality of the water, nor can any proprietor below throw back the water without his license or grant. It was one of the features of that case that the water which the defendant had the right to use, subject to the duty of returning it, was heated when it was returned to the stream, and the jury had assessed damages for that. The Chief Justice said in entering judgment: "As to the right to recover for the injury sustained by the water being returned in a heated state, there can be no question." In Wood *v*. Sutliffe, 16 Jur. 75, and 8 Eng. L. & Eq. R. 217, an injunction was granted to

[Sanderson *v.* The Pennsylvania Coal Co.]

restrain the defendant, against whom a recovery had been had at law, from pouring dye-wares, dye-liquors, madder, indigo or potash into a channel that connected his dye-works with a stream called the "Bowling Beck," on which, below the works, the cotton-mill of the plaintiffs was situated, and in the use of the water of which they claimed prescriptive rights. "I am satisfied from the evidence," the Vice-Chancellor remarked, in the course of his opinion, "that to some considerable extent, the pollution of this stream is inevitable, and that no court of law, or court of equity, nor all the courts in the world, except there were a power of removing all that mass of human beings which now congregate about its banks, ever could restore it to the state in which it once was. But still it does not follow, because there be a certain degree of pollution, which cannot be very accurately measured, and which is inevitable, that therefore everybody has a right to pollute the stream by pouring in immense quantities of filth and pollution from his own works, to make it ten thousand times worse." Pennington *v.* Brinksop Hall Coal Company, 5 Ch. Div. 769, was a case where an injunction was granted to restrain the defendants from pumping water from their colliery into Borsdane Brook, by which the water in use for the cotton-mill of the plaintiffs had been corrupted. While their claim included the assertion of a prescriptive right it was discussed mainly in view of the position of plaintiffs as sub-riparian owners, by the justice who granted the injunction. In answer to the suggestion that in lieu of the remedy sought, damages should be awarded, it was said that "the rights of the plaintiffs as riparian owners, are not limited to their present modes of enjoyment. It was impossible to foresee what modes they, or their successors in title, may resort to, or the extent of damages which would be compensation for the injury which the continued pollution might cause to such new modes of enjoyment." While a right by prescription was the main element of the title of the plaintiffs to a decree in Wood *v.* Sutliffe, and a partial element in the title of the plaintiffs in Pennington *v.* Brinksop Hall Coal Company, it did not enter at all into the consideration of Mason *v.* Hill. There, indeed, it was expressly put aside. "We do not wish," the Chief Justice declared, "to rest a judgment for the plaintiff on this narrow ground." Pennington *v.* The Coal Company was decided so lately as last May, and it would seem that in England this branch of the law has been definitely and firmly settled.

And the question is by no means a fresh one in Pennsylvania. In Barclay *v.* The Commonwealth, 1 Casey 503, the defendant had been convicted of a nuisance in the Quarter Sessions of Bedford, in permitting the wash and waste from his barnyard to escape into the springs dedicated by the Penns to the use and benefit of the inhabitants of the town of Bedford. In this court, the judgment was reversed for an irregularity in the sentence, but the conviction

[Sanderson *v.* The Pennsylvania Coal Co.]

was approved.   The Little Schuylkill Navigation Company, 7 P. F. Smith 142, was an action to recover damages for injury to the plaintiff's forge-dam in the Little Schuylkill river, caused by the throwing of coal dirt, slate and loose earths into the channel of the stream by the servants and employees of the defendants.   The refuse matter was carried down the river by the action of the water, and deposited in the dam.   Other persons were shown to have cast the refuse of their mines into the water, and the court below had charged in substance that the defendants were liable for the combined results of all the deposits.   This instruction raised the main question on the writ of error.   It was held here that the liability of the defendants began with their act on their own land, and was wholly separate and independent of concert with others; and that their tort, having been several when committed, did not become joint because its consequences united with the consequences of the acts of others.   But it was not suggested that under any theory or doctrine of public policy, the defendants had the right to use the river-bed as a dumping-ground for the rubbish of their mines. The corruption of the water was not alleged, it is true, but it is not readily apparent how a principle could be sound that would justify the destruction of the water of a running stream for one purpose, and not justify the destruction of its uses by the same or a similar agency for all purposes whatever.

In the argument here, the ground was distinctly taken that immense public and private interests demand that the right which the defendants exercised in ejecting the water from their mine, should have recognition and be established.   It was said that in more than a thousand collieries in the anthracite regions of the state, the mining of coal can only be carried on by pumping out the percolating water which accumulates in every tunnel, slope and shaft, and which, when brought to the surface, must find its way by a natural flow to some surface stream.   It was urged that the law should be adjusted to the exigencies of the great industrial interests of the Commonwealth, and that the production of an indispensable mineral, reaching to the annual extent of twenty millions of tons, should not be crippled and endangered by adopting a rule that would make colliers answerable in damages for corrupting a stream into which mine-water would naturally run.   These are considerations that are entitled to be well weighed.   In the trial of questions like this before a jury, they ought to be kept steadily in view.   The proprietors of large and useful interests should not be hampered or hindered for frivolous or trifling causes.   For slight inconveniences or occasional annoyances they ought not to be held responsible, and in dealing with such complaints juries should be held with a steady hand.   Only when some material and appreciable injury has been sustained, should a recovery of damages against them be allowed. But there must be one rule of law maintained for all men, and by

[Sanderson v. The Pennsylvania Coal Co.]

that rule all men's rights must be tried and tested. The view so earnestly and ably presented by the counsel here, was pressed upon Mr. Justice Mellor, in the trial of St. Helen's Smelting Co. v. Tipping, 11 H. L. Cases 642—a precedent in every way of interest and value. After the verdict, a motion for a new trial was heard and refused by the Court of Queen's Bench, and on review in the Exchequer Chamber, and afterwards in the House of Lords, the judgment was affirmed. In charging the jury, the judge used this language: "The defendants say, 'If you do not mind, you will stop the progress of works of this kind.' I agree that that is so, because, no doubt, in the county of Lancaster, above all other counties, where great works have been created and carried on—works which are the means of developing the national wealth—you must not stand on extreme rights, and allow a person to say, 'I will bring an action against you for this, that, and so on.' Business could not go on if that were so. Everything must be looked at from a reasonable point of view; therefore the law does not regard trifling and small inconveniences, but only regards essential inconveniences; injuries which sensibly diminish the comfort, enjoyment or value of the property which is affected." In another part of the same lucid charge, the jury were instructed that "if a man by any act, either by the erection of a lime-kiln, or copper-works, or any work of that description, sends over his neighbor's land that which is noxious and hurtful, to an extent which sensibly diminishes the comfort and value of the property, and the comfort of existence on that property, that is an actionable injury." The consequences that would flow from the adoption of the doctrine contended for, could be readily foretold. Relaxation of legal liabilities and remission of legal duties to meet the current needs of great business organizations, in one direction, would logically be followed by the same relaxation and remission, on the same grounds, in all other directions. One invasion of individual right would follow another, and it might be only a question of time when, under the operations of even a single colliery, a whole country side would be depopulated.

Judgment reversed, and *procedendo* awarded.

Mr. Justice PAXSON filed a dissenting opinion.