H. B. BOWLING COAL COMPANY *v.* J. W. RUFFNER.*

(*Knoxville.* September Term, 1906.)

**WATERS AND WATERCOURSES.** Coal mine operator is liable for damages resulting from pumping acidulated subterranean water from his mine into a stream and rendering it unfit for its accustomed use.

Where a coal mine operator pumps acidulated, offensive, and corrosive water from his mine, conveys it by means of a pipe seventy-five feet, and empties it into a tributary drain, from which the water flows naturally into a stream running through the farm of another below, rendering the water unfit for its accustomed use for domestic purposes and for use in the boiler of a mill, such mine operator is liable for the damages caused the said landowner by pumping and forcing such water into the said stream, although such disposal of the water is necessary to the operation of the mine, and is according to the usual and only known way of handling such subterranean waters.

Cases cited and approved:   Cox *v.* Howell, 108 Tenn., 133; and many cases in other States and countries cited and reviewed in the opinion, on pages 186-202.

FROM MORGAN.

Appeal from the Circuit Court of Morgan County.— G. Mc. HENDERSON, Judge.

BROWN & CASSELL and C. C. JACKSON, for Coal Co.

CARR & JONES, for Ruffner.

*As to how far stream may be polluted for mining purposes, see note to Drake *v.* Lady Ensley Coal, I. & R. Co. (Ala.), 24 L. R. A., 64.

MR. JUSTICE MCALISTER delivered the opinion of the Court.

The plaintiff below recovered a verdict and judgment against the coal company for the sum of $516 as damages for the alleged contamination of a stream in which plaintiff claimed certain riparian rights. It is shown in the evidence that the plaintiff, J. W. Ruffner, has for many years owned a farm comprising twenty-nine acres in Morgan county, Tennessee, and that through said farm the waters of a certain stream, known as the "East Fork" of Little Emory river, flowed. Plaintiff is the owner of a steam saw and grist mill situated on said stream on said farm, and it was necessary for him to use the water from said stream for the purpose of operating his mill, and the waters from said stream were also used by plaintiff for household purposes and as stock water.

It further appears that about the 1st of January, 1903, the defendant company began the operation of a coal mine on or near a small tributary of said stream, and has continuously operated said mine from that time; that the mine extends into the mountain a distance of 3,500 feet; that it dips, or falls, as it penetrates the mountain, being about twelve feet lower at its extremity under the mountain than at its mouth; that water rises in the mines and has to be pumped out, for the reason that it cannot flow from the mine of its own gravity, but runs back in the direction in which the mine is being extended or excavated. The water which is pumped out of the mine is simply that which accumu-

lated from the operation of the mine, and makes a stream one and one-half or two inches in size, which is conducted through a four-inch pipe. The pump is not operated all the time, but only as the water accumulates. The water is not discharged at the mouth of the mine, but is conveyed by means of the pipe a distance of seventy-five feet, where it is emptied into a small drain. This drain forms the natural drainage of the basin wherein the mine of defendant is situated.

There is no proof indicating wantonness or negligence on the part of defendants in the operation of this mine; but, on the contrary, the evidence abundantly shows that it is operated in a careful and prudent manner and with the most approved machinery and appliances.

It further appears that the water discharged from the mine is strongly acidulated, due to its contact with the mineral substances in the earth. The offensive and corroding element in said water is an inherent quality of the water itself, and it is shown that waters found in wells dug in the same section contain the same mineral acid substances. There is no proof tending to show that this water has been impregnated with any foreign substances by the defendant company, but that the quality of the water is attributable to the mineral and coal that is found in the earth.

It is further shown in the evidence that it is usual for water to rise in all mines; that it follows all seams of coal, especially those that come on a level; and that, in order to operate the mines, it is necessary to dispose

of this water, either by natural drainage or by pump and siphons.

It further appears that all well-regulated mines use pumps for discharging mine water, where there is not sufficient natural drainage. However, the evidence is undisputed that the plaintiff below has been damaged in consequence of draining the mine water into the East Fork of Little Emory river.

The plaintiff testified that in the spring of 1904 he discovered a change in the character of the water in this stream; that it made the rocks appear yellowish and sticky; that some stock will not drink it, especially when the water is low; that the effect of the water is to corrode iron; that it eats up the flues of his mill, and his injectors cannot work in the water because of its sticky quality, and that he has lost much time in consequence of this; that he has abandoned the use of this water for running the mill, and now hauls the water in dry weather; that he has had to remove his mill from the place where it originally stood in order to render it more accessible to water; and that said removal cost him about $180.

The evidence also shows that the water of said stream had formerly been used for domestic purposes, but that it had been abandoned on account of the quality of the water. The evidence is clear that before the defendant began to operate its mine in January, 1903, the water was pure and wholesome, but that now it cannot be

used for any purpose at all, unless it is that when it is flush some stock will drink it.

The president of the defendant company testified that it would not be possible to invent any percolating arrangement that would free the water from the acid in it before leaving the mine; but he admitted that nothing had ever been done by the company to ascertain if it was possible for this water to be purified before emptying it into the drain.

This is a substantial statement of the material facts presented on the record and which are practically undisputed.

The first assignment of error is that there was no evidence to support the verdict of the jury, and this assignment is based upon the proposition that the facts proved do not as a matter of law make out a case of liability. The real question in the case is presented by the second assignment of error, which challenges the correctness of the charge of the court as embodied in the following language: "That if the plaintiff had been accustomed for a long series of years to use the waters in the stream which flowed over and through his land for running his mill and for domestic purposes, and that prior to the opening of its mine by the defendant said waters were pure, and suitable for the purpose for which they were being used, and that the defendant opened its coal mine on a higher level above plaintiff's land and on the waters of the same stream, and that defendant found it necessary, in the operation of its mine, to pump the wa-

Coal Co. v. Ruffner.

ters out of said mine which found their way by natural gravity into said stream, and that the waters from said stream were contaminated, and so changed the quality of the water flowing through plaintiff's farm as to render it unwholesome and unfit for its accustomed use and enjoyment, whereby the plaintiff was damaged, then the defendant would be liable; and that it could make no difference that defendant found it necessary to pump the water found in subterranean streams sunk by defendant in mining entirely out of the mine, and discharged it on the surface of the earth in order to successfully carry on its mining. Nor was it material that no other practical way of carrying on mining and disposing of said waters is known, nor that defendant is conducting his business according to the usual and only known way of handling such subterranean waters. Such evidence is admissible to show absence of malice and wantonness on the part of defendant, but it is not a complete defense to this suit."

It is insisted on behalf of the coal company that this charge was erroneous, and that the court should have charged the jury that the defendant had the right to the natural use and enjoyment of its own property in the usual and ordinary way such property is used, so long as such use was free from malice or negligence, and that if plaintiff was damaged by reason of such use on the part of the defendant company, without malice or negligence, it is not liable.

In support of the company's contention counsel cites

the case of *Penn. Coal Co.* v. *Sanderson,* 113 Pa., 126, 6
Atl., 453, 57 Am. Rep., 445.  In that case it appeared
that in the year 1868, the plaintiff, Sanderson, and wife,
bought a tract of land near Scranton, Pennsylvania, on
which they erected a handsome residence and other val-
uable improvements.  A stream of water called "Mead-
ow Brook" ran through this tract.  Before its purchase
plaintiff traced this stream to its source and found the
water to be perfectly pure, and it is said the existence
of this stream was one of the principal inducements to
the purchase of the land.  Dams were built across the
stream for fish and ice ponds and to supply a cistern, and
the water was carried in pipes from the cistern to a ram,
and thenceforth to a tank in the back of the house.  After
these improvements had been made, the defendants
opened a coal mine on the site of a hill three miles above
the house of plaintiff.  A drift was first made into the
mine, and afterwards a shaft was sunk.  The water
which collected in the drift and shaft was pumped out
by powerful engines and allowed to flow by the law of
gravity into Meadow Brook.  The effect of this was that
the water of the stream was so corrupted that the fish
in the pond were destroyed and vegetation along the
banks died, the pipes carrying the water were corroded
and eaten out, and the water rendered totally unfit for
domestic purposes, so that the family had to abandon the
same for every purpose in the year 1875.

It was conceded that the mine water was acid and

Coal Co. v. Ruffner.

unfit for use, and it appeared that mine water is usually impregnated with acid.

In the midst of its opinion the court said:

"It will be observed that the defendants have done nothing to change the character of the water or to diminish its purity, save what results from the natural use and enjoyment of their own property. They have brought nothing on the land artificially. The water as it is poured into Meadow Brook is the water which the mine naturally discharged. Its impurity arises from natural, not artificial, causes. The mine cannot, of course, be operated elsewhere than where the coal is naturally found, and the discharge is a necessary incident to the mining of it.

"It must be conceded, we think, that every man is entitled to the ordinary and natural use and enjoyment of his property. He may cut down the forest trees and clear and cultivate his land, although in so doing he may dry up the sources of his neighbor's springs or remove the natural barriers against wind and storm. If, in the excavation of his land, he should uncover a spring of water, salt or fresh, acidulated or sweet, he will certainly not be obliged to cover it again, or to conduct it out of its course, lest the stream in its natural flow may reach his neighbor's land. It has always been considered that land on the lower level owes a natural servitude to that on a higher level, in respect of receiving, without claim for compensation by the owner, the water naturally flowing down to it.

"The defendants, being the owners of the land, had a right to mine the coal. It may be stated as a general proposition that every man has the right to the natural use and enjoyment of his own property; and if, while natural in such use and enjoyment, without negligence or malice on his part, an unavoidable loss occurs to his neighbor, it is *damnum absque injuria;* for the rightful use of owners in land may cause damage to another without any legal wrong. Mining in the ordinary and usual form is the natural user of coal lands. They are for the most part unfit for any other use."

It is earnestly insisted on behalf of plaintiff in error that these principles are applicable in the present instance, and that when, in the course of mining operations, acidulous water rose in the mines, it was necessary, in the natural use and enjoyment of the property, that this water should be pumped up and conducted from the mines by means of pipes, and notwithstanding it was conducted seventy-five feet from the mouth of the mine, and there emptied into a drain which flowed into the East Fork of Little Emory river, contaminating the water and rendering it unsuitable for domestic or commercial purposes by the lower riparian proprietors, no liability attaches to defendant company for the damages so sustained.

2. The plaintiff below also grounds his right of recovery upon the principle that, being a riparian owner on a stream flowing through his farm, he had the absolute right to the flow of the water over and through his

farm undiminished in quantity and unimpaired in quality.

The principle invoked is well settled, and is thus stated in *Cox* v. *Howell*, 108 Tenn., 133, 65 S. W., 868, as follows: "The general proposition of law that the owner of land across or over which a stream of water flows has a right to have it flow over the land in its natural channel, undiminished in quantity and unimpaired in quality, except so far as is inseparable from the reasonable use of the water from the stream for the ordinary and useful purposes of life by those above him on the stream, is well established by an almost unbroken current of authority."

Now, it is insisted that the Bowling Company does not occupy the position of a riparian owner in the ordinary and reasonable use of the stream, in that it is not enjoying the water for the "ordinary purposes of life." It is said that the company only uses the channel, instead of the water, for drainage purposes, to convey the poisonous waters from its mine. It is further insisted that the water thus turned loose is not the water in its natural state as it runs down the mountain gorges, but that it is dug up and started away from the mine by machinery, conveying it thus by artificial means seventy-five feet from the mouth of the mine, down to the little drain where it begins to flow naturally.

In a word, the insistence of defendant in error is that the company does not use the water of the East Fork of Little Emory river, but only uses the channel of the

stream to get rid of its accumulation of water in the mine, and that the natural flow of the stream is thus impaired in quality.

It is further said the proof shows that the water in defendant's mine does not take the natural course to the stream, but is put into the stream by artificial means. In the case already quoted it was said, in speaking of the rights of a riparian owner: "He cannot say of any particular pint or globule of water that that pint or globule is his. He can only say that he is entitled to the flow of that water in the accustomed manner, both as to quantity and as to quality."

Again it was said: "Every proprietor has an equal right to use the water which flows in the stream, and consequently no proprietor can have the right to use the water to the prejudice of any other proprietor without the consent of the other proprietors who may be affected by the operations."

Again the court said: "Every riparian owner has a right to use primarily the water of a flowing stream for domestic purposes for the support of life of man and beast, and, in addition, in a proper and reasonable way for the irrigation of his land, or for the operation of his machinery on his land, provided the volume of water in the stream warrants this use above domestic purposes."

In *Lawson* v. *Price*, 45 Md., 123, it was held: "That if one person obstructs the flow of a stream of water to the use of which another person is entitled—such as a mill race—he must pay damages, irrespective of any

question of negligence." But it is said these principles are not applicable in the present instance, since it appears that the defendant company, in inflicting the injuries sustained by the plaintiff, was in the natural and reasonable enjoyment of its own property, and hence is not liable in damages. While the principle invoked is well recognized, it has no application to the facts presented in the present record. The facts disclosed herein show that the mine water causing the pollution of the stream did not escape from the mine during the lawful progress of the work and find its level by the laws of gravitation in the stream so contaminated.

But it affirmatively appears that the mine owner, in order to benefit himself, deliberately collected the mine water in pipes and, conveying it through the mine and to a distance of seventy-five feet beyond its mouth, emptied it into the stream or tributary flowing into the East Fork of Little Emory river, so that it is perfectly apparent that the injury sustained by the plaintiff below was not the inevitable consequence of a natural use and enjoyment of the defendant's property, but was the result of the artificial collection and disemboguement of poisonous waters into a stream where the plaintiff was enjoying his undoubted riparian rights.

The principle applicable in the present case is well illustrated by the text of Thompson on Negligence, vol. 1, section 709, as follows: "The owner of a mine at a higher level than an adjoining mine has a right to work the whole of his mine in the usual and proper manner

for the purpose of getting out the minerals in any part of his mine; and, if he so conducts his works, he will not be liable for damages caused by water which flows by gravitation into such adjoining mine. For damages thus occurring such mine owner can only be made liable on proof of negligence. But the rule stops here. The occupier of the higher mine has no right to be an active agent in sending water into the lower mine; nor is the occupier of the lower mine subject to the servitude of receiving water conducted by man from the higher mine. 'Each mine owner has all the rights of property in his mine, and among them the right to get all minerals therefrom, provided he works with skill and in the usual manner. And if, while the occupier of the higher mine exercises that right, nature causes water to flow to a lower mine, he is not responsible for this operation of nature.' If the owner of the lower mine intends to guard against this operation, he must leave a barrier at the upper part of his mine to keep back the water of his higher neighbor. The law imposes these regulations, for the enjoyment of the somewhat conflicting interests does not authorize the occupier of the higher mine to interfere with the gravitation of the water, so as to make it more injurious to the lower mine or dangerous to himself"— citing *Smith* v. *Kenrick*, 7 C. B., 515; *Baird* v. *Williamson*, 15 C. B., (N. S.), 376; *Acton* v. *Blundell*, 12 Mee. & W., 324; *Fletcher* v. *Smith*, L. T., 71, 305; s. c., affirmed in 2 App. Cas., 781.

In 24 Cal., 367, it was said: "An appropriation of

Coal Co. v. Ruffner.

water of a stream in a mineral region for mining pur-
poses is taken subject to the rights of a prior proprietor
of land for agricultural purposes and is liable for inju-
ries resulting to the premises from his use of the water.''

In *Tennessee Coal, Iron & Railroad Co.* v. *Hamilton,*
(Ala., Nov., 1893), 14 South., 167, it was held by the su-
preme court of that State as follows: "An upper ripar-
ian owner cannot use the water of a stream for mining
purposes in such a way as to render it unfit for domestic
use of a lower proprietor, or so use it as to fill up the
channel, and cause the debris to be deposited on his
land."

In *Barrett et al.* v. *Mt. Greenwood Cemetery Ass'n et
al.,* 159 Ill., 385, 42 N. E., 891, 31 L. R. A., 109, 50 Am.
St. Rep., 168, it was held:

"(1)  The construction of a sewer by a cemetery as-
sociation to underdrain ground used for burial purposes
and to discharge it into a spring brook will be enjoined
at the suit of the owners of farm lands on the stream be-
low, where it is shown that the effect would be to so pol-
lute the water as to render it unfit for use either by hu-
man beings or stock.

"(2)  The fact that the waters of a stream are con-
taminated to some extent by the natural and unavoid-
able drainage of surface water into it does not justify
their deliberate pollution by the underdrainage of a cem-
etery therein for the purpose of improving the site as a
burial place."

117 Tenn—13

. The above case is also published in 3 Am. & Eng. Dec. in Equity, 629, where in a very learned note the annotator says: "Since the whole doctrine of nuisance rests upon the principle of *'sic utere tuo alienum non laedas,'* it would naturally follow that the pollution of a stream by the discharge into it of refuse and water from a mine would give a right of action for damages and be ground for an injunction; and such has been the general rule. It is no defense, therefore, that the pollution was the necessary result of the mining operations. *Beach* v. *Sterling Iron & Zinc Co.,* 54 N. J. Eq., 65, 33 Atl., 286. This rule prevails almost everywhere but in Pennsylvania, where one case is opposed to the general current of authority. In *Penna. Coal Co.* v. *Sanderson,* 113 Pa., 126, 6 Atl., 453, 57 Am. St. Rep., 445, it was held that the pumping of sulphur water for a coal mine, which flowed into a brook and rendered it totally unfit for domestic use, was not such a nuisance as would entitle the lower riparian owners to recover damages."

The case had already been before the supreme court twice, in *Sanderson* v. *Penna. Coal Co.,* 86 Pa., 401, 27 Am. Rep., 711, and *Penna. Coal Co.* v. *Sanderson,* 94 Pa., 302, 39 Am. Rep., 785, and each time the court decided in favor of the lower owner. In commenting on this case it is unnecessary to do more than quote the words of Lord Shand in *Young* v. *Bankier Distillery Co.* [1893] App. Cas., 691, 700: "In that case undoubtedly the court held that the owners of a mine were entitled to pump up water from the lower strata of the mine, and

to send it into an adjoining stream, although the quantity of the water was thereby increased and its quality so affected as to render it totally unfit for domestic purposes by the lower riparian owners. The case had been twice previously before the court, and on both occasions the judgment was given against the mine owners. On the third occasion, which occurred in consequence of a third trial to assess the damages, the jury found a very large sum due to the lower owner; but the verdict was quashed, and the whole case reconsidered with reference to the legal rights of the parties, and with the results I have stated. In a court of seven judges, there were three who dissented from the judgment, including the chief justice of the State. This circumstance and the grounds of the judgment seem to me to be sufficient to deprive the case of any real weight. These grounds appear to me from a perusal of the judgment to be fairly stated in the headnote as follows: 'The use and enjoyment of a stream of pure water for domestic purposes by the lower riparian owners, who purchased their land, built their houses, and laid out their grounds before the opening of the coal mine, the acidulated waters from which rendered the stream entirely useless for domestic purposes, must *ex necessitate* give way to the interests of the community, in order to permit the development of the natural resources of the country, and to make possible the prosecution of the lawful business of mining coal.' I shall only add that while the enormous value of the mining interests in the district of Pennsylvania, from which the

case came, and which is fully explained in the judgment, might have formed a good reason for appealing to the legislature to pass a special measure to restrain any proceeding by interdict at the instance of surface proprietors, and to confine them to a right to damages only for injury sustained, that value could in my opinion afford no good legal ground for allowing the proprietor of a mine so to work his minerals for his own profit as to destroy or greatly injure his neighbor's estate, by subjecting it, by means of artificial operations, to the burden of receiving water enlarged in quantity and destroyed in quality without payment of compensation or damages for the injury done. The case has no application to the present, because the decision was based on special circumstances, as to the great relative value of the minerals as compared with the surface in the district, and because, in any view, the decision seems to me to have been making law, rather than interpreting the law, so as to give effect to sound, just, and well-recognized principles as to the common interest and rights of upper and lower proprietors in the running water of a stream." Even in Pennsylvania, the doctrine of the *Sanderson Case* is carefully limited to the natural drainage of the mine water; and any other means of getting rid of it will be enjoined. *Getting* v. *Union Imp. Co.*, 7 Kulp (Pa.), 493.

The doctrine of the *Pennsylvania Case* has been repudiated in New Jersey. In *Beach et al.* v. *Sterling Iron & Zinc Co.*, 54 N. J. Eq., 65, 33 Atl., 286, the authorities

on this subject were fully reviewed in a very able and exhaustive opinion by Pitney, V. C., and the conclusion reached that *Penn. Coal Co.* v. *Sanderson,* supra, is opposed by the great weight of authority both in this country and in England.

In the New Jersey case the object of the bill was to enjoin the pollution of a natural water course. The complainant, Beach, was the owner, and the cocomplainant, the manufacturing company, was lessee in possession, of a paper mill intended for making white tissue paper situate on the Wallkill river, at Hamburg, in Sussex county, and driven by the waters of that river, etc.

The defendant is the owner of a mining property situate near the river at a place called "Greenspot," about a mile and a half upstream and southward from the paper mill. The complaint was that the defendant company in its mining operations pumped out of its mine and discharged into the river, upstream from the plaintiff's mill, large quantities of turbid and discolored water, which affected the whole stream and rendered it unfit for use for making white tissue paper when it reached their mill.

Among other defenses, defendant claimed it had a right to continue its mining operations, although the effect was to increase the discoloration of the water of the river.

In the midst of the opinion the court said:

"Several matters are urged in defense to this case:

First, but faintly, that the doctrine finally established by a bare majority of a divided court in Pennsylvania, in *Coal Co.* v. *Sanderson,* 113 Pa., 126, 6 Atl., 453, 57 Am. Rep., 445, should be adopted here. . . . The doctrine of that case is shown . . . to be inharmonious with a long line of previous decisions in Pennsylvania, and has not been, so far as we can learn, followed in any other State—certainly not in this State. It was repudiated in Ohio, whose mining interests are quite large, in the recent and well-considered case of *Iron Co.* v. *Tucker,* 48 Ohio St., 41, 26 N. E., 630, 12 L. R. A., 577, 29 Am. St. Rep., 528. . . . It was not suggested on the argument that the doctrine ever had the least foothold in this State. No case of a stream fouled by mining operations has, indeed, ever, so far as I know, been presented to our courts; but the right of a riparian proprietor to have the waters of the stream come to him unchanged in quality, as well as undiminished in quantity, has been determined in the clearest and most positive manner. In fact, the doctrine stated tersely by Chancellor Kent in *Gardner* v. *Village of Newburgh,* 2 Johns. Ch., 162, 166, 7 Am. Dec., 526 : 'A right to a stream of water is as sacred as the right to the soil over which it flows. It is a part of the freehold'—has always been adhered to by our courts. I need only refer to *Holsman* v. *Bleaching Co.,* 14 N. J. Eq., 335, and *Water Co.* v. *Watson,* 29 N. J. Eq., 366. In the last case the right was stated by the learned master in an extremely clear and comprehensive manner, and the decree advised by him

Coal Co. v. Ruffner.

was unanimously affirmed on appeal for the reasons given by him. The facts of that case are in a manner analogous to those here under our consideration.

"Watson owned and operated a bleachery, which required for use clear and pure water, which he obtained from a small stream running through his land. The water company, desiring to supply the city of Passaic with potable water, proposed to take this small stream above the bleachery and substitute for it an equal or greater quantity of Passaic river water drawn from the Dundee Canal and used to drive its pumps. This the court restrained, on the ground that the substituted water was not of an equal purity with that abstracted.

"There is a line of cases of pollution by mine water in England which sustains the general doctrine. *Hodgkinson* v. *Ennor*, 4 Best & S., 229, was the case, as here, of a paper maker against the miner who had permitted dirty washings of lead ores to run through rents, called 'Swallets,' in limestone rock, into a subterranean stream, rendering the water, which in its course came to plaintiff's paper mill, unfit for use in the manufacture of paper; and the action was sustained by Chief Justice Cockburn and Judges Blackburn and Mellor. *Magor* v. *Chadwick*, 11 Adol. & E., 571, was a suit by a brewer against a miner. *Pennington* v. *Coal Co.* [1877], 5 Ch. Div., 769, was a suit by a manufacturer against a coal miner, where the only allegation of injury was that the acid contributed to the water from the mine rendered it less fit for use in the engine boilers driving the ma-

chinery of the plaintiff's mill. The injunction was al-
lowed. Defendant relied without success upon the ground
taken in *Sanderson* v. *Coal Co.,* supra, that the acid
could not be removed from the water, that there was no
means of remedying the evil, and an injunction would
absolutely stop its work. The learned judge (Fry) re-
fused even to exercise the right given by the English
statute to give damages, instead of an injunction."

The court then cited the case of *Young* v. *Distillery
Co.* [1893], App. Cas., 691, decided in the House of
Lords on appeal from Scotland. It appeared in that
case that the riparian proprietor (Bankier) the plaintiff
there, was a distiller, and used the water of the stream
in his distillery, a process presumably for making mash,
for which it was peculiarly fitted by reason of its soft-
ness. The added mine water did not render it unfit for
ordinary purposes, there called primary purposes, but
by reason of its hardness rendered it less fit for distill-
ing purposes. *Coal Co.* v. *Sanderson* was cited, but the
court repudiated its doctrine, and was unanimous in
judgment in favor of the respondent, who was the plain-
tiff and had judgment below. Lord Macnaghten said:

"Then the appellant urged (precisely as does the de-
fendant here) that working coal was the natural and
proper use of their mineral property. They said they
could not continue to work unless they were permitted
to discharge the water which accumulates in their mine.
They added that this water course is the natural and
proper channel to carry off the surplus water of the dis-

trict.  All that may be very true; but in this country, at any rate, it is not permissible in such a case for a man to use his own property, so as to injure the property of his neighbor."

The court cited several English cases, and Gould on Waters, sec. 219, and Higgins on Water Courses, p. 132 *et seq.*

The New Jersey court then refers to the argument deduced from a "natural user" of property, and to the claim that:

"If it be unlawful for defendant to cast into the stream the muddy waters from its mine, it is also unlawful for the farmer to plow his land and allow the muddy water which runs from it after a heavy rain to reach the river. But the very statement of the two cases shows the absence of analogy between them.  In the first place, the water from the plowed field comes thereon by natural courses beyond the farmer's control, and runs by gravity to the stream, while in the case of the mining the water is, as here, found and raised by artificial means from a level far below that of the river, and would never reach it but for the act of the miner; and, in the second place, by the common law of the land, every owner may cultivate his land without regard to its effects upon his neighbor, while such is not the law as to mining.

"The supreme court of Ohio in *Iron Co.* v. *Tucker*, 48 Ohio St., 41, 58, 26 N. E., 630, 633 (12 L. R. A., 577, 29 Am. St. Rep., 528), repudiates the notion that

mining was a natural use of land in the sense that farming is."

In conclusion, we shall cite only one additional authority, Shearman & Redfield on Negligence, secs. 733, 734:

"It is a general principle that any person who, without authority, diverts the whole or any part of the water of a stream from its natural course, or interferes with its natural current, is responsible absolutely, and without any question of negligence, to any one who is entitled to have the water flowing in its natural state.

"Any use of the land near a stream, or of the water of a stream itself, which renders the water unwholesome, offensive, or unfit for the purposes for which it is used, is unlawful, and any riparian owner who is damaged by such unlawful acts, has an action for his damages against the author of the wrong."

We are of opinion that the doctrine announced in *Coal Co.* v. *Sanderson,* supra, is opposed by the great weight of authority in this country and in England, and is in our judgment subversive of fundamental private rights while it discards, discredits, and discrowns the honored principle of the common law embodied in the maxim, *"sic utere tuo ut alienum non laedas."*

We are of opinion the law was fully and correctly expounded by the trial judge, and the judgment is therefore affirmed.