ROBINS FARMS, INC., Plaintiff and Appellant, *v.* NARCISO CORREA ET AL., Defendants and Appellees.

No. 11950. Decided March 9, 1962.

---

*McConnell, Valdés & Kelly* and *Fowler V. Harper* for appellant.
*Ramón Gandía Biscombe,* Counsel for the Land Authority.
*Rivera Zayas* and *Rivera Cestero & Rúa* and *A. Segurola* for
Globe Indemnity Company and Narciso Correa, appellees.
*José R. Fournier* for Gregorio Nieves, appellee.

Division composed of Mr. Justice Pérez Pimentel, as Chief Judge
of Division, Mr. Justice Santana Becerra and Mr. Justice
Rigau.

MR. JUSTICE RIGAU delivered the opinion of the Court.

On October 26, 1953, plaintiff Robins Farms, Inc. filed
a claim for damages against Narciso Correa and Gregorio
Nieves, Vega Alta farmers, alleging that they used and
sprayed on their farms the weed killer known as "2-4-D"

without taking precautions to prevent damage to neighboring properties; that the winds carried the weed killer to the nearby tomato plantations of the plaintiff causing their destruction, which damages he estimated at $40,000; and that the losses sustained by the plaintiff were due solely and exclusively to the acts of the two afore-mentioned defendants. Two months and 23 days after the complaint was filed the plaintiff filed an amended complaint joining as codefendants the Land Authority of Puerto Rico and the Globe Indemnity Co. (insurer up to $5,000 of the Authority), and alleging that the defendants stored and/or used the weed killer 2-4-D on their farms without taking precautions, thereby causing the aforesaid damages.

The trial having been held on the merits, the Superior Court dismissed the complaint. The appellant maintains that the trial court erred (1) in refusing to correct the record of inspection as respects two particulars; (2) in failing to find that the three defendants used 2-4-D; (3) in failing to find that each defendant caused or contributed to cause the damage to the plaintiff in the absence of evidence that the damage was caused by other persons; (4) in failing to hold the defendants guilty of civil liability (a) regardless of whether or not they were negligent, (b) or because they were negligent, (c) or because they created a nuisance; (5) in concluding that even if the 2-4-D had come from the defendants' farms as a result of their negligence, such negligence was not the proximate cause of the damages; and (6) in being prejudiced against the plaintiff.

We need not discuss the first error assigned because, even if the record of inspection had been amended as sought by the plaintiff, it would not have altered our decision at all in view of our conclusions on the evidence.

The remaining errors are so related to each other that we will discuss them jointly. To this end, we need to examine more closely the facts of the case. One of the purposes of

the Land Authority is "to facilitate the utilization of the land for the best public benefit under efficient and economic production plans," and the law authorizes it "to take all action leading to the most scientific, economic and efficient enjoyment of land" of Puerto Rico. Section 7 of Act No. 26 of April 12, 1941 (Sess. Laws, p. 388, 28 L.P.R.A. § 247). In the discharge of those duties, the Land Authority entered into a contract in the latter part of 1952 with Robins Farms, Inc. for the establishment of a farm for agricultural production by using the system known as "hydroponics," which consists in cultivating plants in solutions of chemical agents and water instead of cultivating them directly in the soil. (Presumably, this form of making agriculture produces greater yield than the traditional way, although it requires a greater investment of capital.) In the recitals of the contract it is stated that the installation and operation of that system of agricultural production was necessary in Puerto Rico and would be beneficial to the economy of the country, and that the Authority agreed to certain conditions and commitments as an inducement to Robins to carry out the aforesaid agricultural project.

In his findings of fact the trial judge states that Robins Farms, Inc. was organized in the latter part of 1952 with a capital of $42,700, including a $10,000 loan by the Government Development Bank. Robins Farms, Inc. would pay to Robins an annual salary of $10,000. The most important conditions of the aforesaid contract between the plaintiff and the Land Authority are the following: The Authority leased to the plaintiff a parcel of land situated in Vega Alta; it granted to the plaintiff an option to purchase those lands; it would procure industrial tax exemption, otherwise within 12 months counted from the date of the contract the Authority, at the plaintiff's option, would be bound to purchase from the plaintiff all the installations, equipment, tanks, structures, etc., which the plaintiff had on such land, at cost price

less depreciation (the price could not exceed $100,000), plus a sum equal to 10 per cent of the resulting price, for construction services (which sum could not exceed $10,000).

The plaintiff undertook the operation of its farm, which it devoted exclusively or mostly to the production of tomatoes, and the first two crops produced a gross income of $9,548.99 and $11,587.99. It was at the third crop that the tomato plantation (about three cuerdas) deteriorated to a great extent, and this crop produced a gross income of only $2,345.15. Late in January or early in February 1954, Robins exercised its option to sell and sold to the Authority the structures on the land at their cost price, which they fixed at $54,000. On February 15, 1954, Robins became an employee of the Land Authority with an annual salary of $10,000. The Authority entrusted to Robins the administration of the same "hydroponic" farm of Vega Alta. On the date of the trial (November 1955) Robins was still an employee of the Authority.

Briefly, the amended averment of the plaintiff is to the effect that it undertook the cultivation of three cuerdas of tomatoes early in 1953, and that in June of that year the crop was destroyed as a result of the action of 2-4-D which defendants Correa and Nieves used in connection with the cultivation of sugar cane and which codefendant Land Authority stored and used in connection with pineapple cultivation, all of which took place on adjoining lands or very near to those of the plaintiff.

The plaintiff alleges that the trial court erred in failing to find that the three defendants used 2-4-D (error No. 2). The evidence is most conflicting. The three defendants denied that they used 2-4-D. The evidence showed that Nieves is engaged in cattle raising and not in the cultivation of sugar cane. There is evidence that Correa purchased around those months some quantities of that weed killer, but there is no evidence that he used it. The same is true of

the Authority. There is evidence that it had some containers of that weed killer, but not a single witness testified that it used it on the pineapples. Osvaldo González, who on the date of this action managed the Authority's pineapple plantation which adjoins Robins' farm, testified categorically that weed killers were not used on the pineapple plantation. It is the testimonies of Mr. Robins, president of the plaintiff, and of his assistant Davis which connect Correa and Nieves with the use of the weed killer. In view of this conflict in the evidence, the trial court stated in its findings that it had not been established that the defendants sprayed the weed killer. It was established, however, by their own testimony at the trial, that five farmers near Robins' property used the weed killer 2-4-D. It was incumbent on that court to resolve the conflict and we find no reason to disturb its finding. *People v. Amadeo*, 82 P.R.R. 98 (1961); *Vargas v. Sánchez*, 79 P.R.R. 754 (1957); *Martín v. Torres*, 79 P.R.R. 370 (1956); *Rutledge v. Gill*, 78 P.R.R. 665 (1955). We are of the opinion that error number two was not committed. What has been said with respect to error number two makes it unnecessary to discuss error number three, which is a corollary of number two, but it brings us forthwith to the consideration of error number six which raises the question of prejudice of the trial judge against the plaintiff.

█ It is true that during the trial the judge made several remarks which he should not have made, and which show his dissatisfaction with the relation between Robins and the Land Authority and the terms of the contract. Taking those circumstances (such relation and the terms of the contract) isolatedly, the judge's reaction is comprehensible. He believed that the contract was very advantageous to the plaintiff and that the Authority was assuming all the risks, while Robins could not lose. Even if it were so, what the judge evidently did not bear in mind was the social, public objectives pursued by the Authority by that contract and the

project, objectives which are set forth in the afore-cited provisions of the Land Law of Puerto Rico. The project was an exploration searching for more productive ways of making agriculture. In evaluating the trial judge's attitude in the light of the entire case, we believe that his nonconformity with the aforesaid circumstances was not such as to vitiate the proceedings in such a way as to warrant reversal.

 In upholding the weighing of the evidence made by the trial court, the implication is that error number four was not committed. In urging that we hold the defendants civilly liable regardless of whether or not they were negligent, the plaintiff requests that we apply to the case the absolute liability rule or doctrine.[1] According to this doctrine, there is liability even though there has been no negligence, but it is confined to extraordinary, exceptional, or abnormal cases. It does not apply to usual situations nor to the normal uses of the property.[2] In order to determine what is meant by an extraordinary or abnormal situation which would warrant the application of this rule, the courts take into consideration the type of activity concerned, the place and the manner in which it was carried out, the uses of the community affected, and the degree of risk which such activity involves. For example, to blast dynamite on an uninhabited field in carrying out a useful and lawful activity requires the exercise of great prudence, but probably it would not entail absolute liability. On the contrary, to dynamite a structure in the very city would entail absolute liability, since regardless of the precautions taken the act would be very dangerous, is inappropriate in that place, is not usual, etc. The basis of the absolute liability is the intentional behavior in exposing the community to such a risk, regardless of all the precautions taken. Such conduct is "socially unreason-

---

[1] In English called "absolute liability" at times and "strict liability" at other times.

[2] Prosser, Law of Torts 329, § 59 (2d ed. 1955).

able." [3] This rule creates, it may be said, a fault without intention and without negligence, a fault of social content.

This doctrine of absolute liability for extraordinary activities is comparatively recent and in the United States it is still controversial. A number of state jurisdictions have accepted it and others have rejected it explicitly.[4] The leading case from which it has developed is *Rylands* v. *Fletcher*, decided in England in 1868.[5] Public policy considerations have played an important role in the acceptance or rejection of the doctrine by the different state jurisdictions in those cases involving the use of weed killers and insecticides.[6] A Pennsylvania court has said that the imposition of absolute liability in connection with a particular activity is essentially a problem in "social engineering." [7] It has been pointed out that in the American jurisdictions the vicissitudes of this doctrine bear great relation to the type of agricultural crop prevailing in each state. Some jurisdictions have been reluctant to apply the doctrine when the insecticide or weed killer is necessary to protect the main crops of the state.[8] That doctrinal reality reminds us of the following words of Mr. Justice Holmes: "The very considerations which judges most rarely mention, and always with an apology, are the secret root from which the law draws all the juices of life. I mean, of course, considerations of what is expedient for the community concerned. Every important principle which

---

[3] Prosser, *op. cit.* at 318.

[4] Prosser, *op. cit.* at 332–34.

[5] *Fletcher* v. *Rylands*, 3 H. & C. 774, 159 Eng. Rep. 737 (1865), reversed, *Fletcher* v. *Rylands*, L.R. 1 Ex. 265 (1866), aff'd, *Rylands* v. *Fletcher*, L.R. 3 H.L. 330 (1868).

[6] See *Booth* v. *Rome, W.&O. T. R. Co.*, 140 N.Y. 267, 278, 35 N.E. 592, 596 (1893); *Gulf Pipe Line Co.* v. *Sims*, 168 Okla. 209, 213, 32 P.2d 902, 906 (1934); *Pennsylvania Coal Co.* v. *Sanderson*, 113 Pa. 126, 155–56, 6 Atl. 453, 464 (1866); *Turner* v. *Big Lake Oil Co.*, 128 Tex. 155, 165–66, 96 S.W.2d 221, 226 (1936).

[7] *Blake* v. *Fried*, 95 A.2d 360, 365 (Pa. Super. 1953).

[8] *Crop Dusting: Legal Problems in a New Industry*, note in 6 Stan. L. Rev. 69 (1953).

is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy." [9]

■ The distinguished legal representatives of the plaintiff cite in their brief a fragment of the language used by Mr. Justice Blackburn.[10] That language was substantially limited on appeal in the House of Lords. In his opinion, Lord Cairns said that the principle applied only to the non-natural uses of the defendants' land. The emphasis of the opinion, as finally drafted, was shifted to the abnormal and inappropriate activity to which the defendants, according to the court, devoted their land.[11] Summing up, the prevailing doctrine recognizes the rule of absolute liability in those cases in which the defendant carries on an activity which involves a high degree of risk to others and is abnormal in the community and inappropriate to its surroundings.[12] In view of the conclusions reached on the evidence, we need not decide in this case whether or not we would be willing to incorporate this doctrine into our law.

Error number five was not committed, since it was a hypothetical comment made by the trial judge which did not serve as a ground for his decision. We see no reason for imposing on plaintiff $1,200 for attorney's fees. For the reasons stated, the judgment rendered in this case by the Superior Court, Bayamón Part, on November 4, 1955, will be affirmed, except that it will be modified so as to eliminate the payment of attorney's fees by the plaintiff.

---

[9] The Common Law 35 (1946 ed.).

[10] In *Rylands* v. *Fletcher, supra.*

[11] For an exhaustive discussion of this case, see Prosser, *The Principle of Rylands v. Fletcher*, in Selected Topics on the Law of Torts 135, 139 (1953). Also, and also on the theory of absolute liability, see ch. 14 of 2 Harper & James, The Law of Torts 785 *et seq.*, §§ 14.1 to 14.16 (1956 ed.); and annotation, *Liability for Injury Consequent Upon Spraying or Dusting of Crop*, 12 A.L.R.2d 436.

[12] Prosser, Law of Torts 329, § 59 (2d ed. 1955).